170 N.J. Super. 282 (1979)
406 A.2d 234
FRANCINE MINEY, PLAINTIFF,
v.
CHARLES H. BAUM, RICHARD S. BENSON, AND SERENA P. BENSON, DEFENDANTS, CHARLES BAUM, THIRD PARTY PLAINTIFF,
v.
MOTOR CLUB OF AMERICA INSURANCE CO., THIRD PARTY DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 25, 1979.
*283 Messrs. DeRose & Rinaldi, attorneys for plaintiff (Mr. Donald J. Rinaldi, of counsel).
Mr. Paul H. Greenberg, attorney for Charles Baum, defendant and third-party plaintiff.
Messrs. Ronca & McDonald, P.A., attorney for Richard and Serena Benson (Mr. John J. Ronca, of counsel; Dennis M. DiVenuta, on the brief).
*284 Messrs. Feuerstein, Sachs & Maitlin, attorneys for third-party defendant Motor Club of America Ins. Co. (Mr. Raymond J. Fleming, of counsel).
YANOFF, J.S.C.
This is a suit arising out of an automobile accident in which Charles Baum is the defendant. Insurance carrier Motor Club of America (MCA) was brought in as third-party defendant and disclaimed. The preliminary question is, therefore, whether it is obligated to defend. The legal issue is whether the cancellation requirements of N.J.S.A. 17:29C-7 and 8 apply to a binder in effect more than 60 days.
By agreement, this was tried before me without a jury.
The facts are summarized as follows: Charles Baum ("Charles") operated an automobile covered for automobile liability by a policy issued by MCA to his mother. Late in July or early August 1975 his father Jules Baum ("Jules"), a man experienced in the insurance business and a former insurance broker, asked Mr. Miller, of Philip V. Wilder & Co. Inc., an agent for MCA, to have Charles' automobile taken off his mother's policy and a separate policy issued to him. Charles' application for a one-year policy beginning August 8, 1975, signed by Miller, reads: "Binding Application  Issue Policy Immediately." Pending the issuance of the separate policy, Wilder issued Binder or Policy No. 3216, which states: "Effective date 8/7/75. This card expires 60 days after the effective date shown above."
Miller encountered difficulty in obtaining insurance for Charles with MCA for unspecified reasons. Under date of August 28, 1975 he wrote Jules:
In accordance with your request, I have requested that the company remove your son Charles form [sic] your policy and issue him his own. However, the company informs me that they are reluctant to do so and suggest that you palce [sic] him in the Assigned Risk Program. The company is proceding [sic] to remove Charles from the policy even though the [sic] cannot issue him a seperate [sic] policy. I would suggest that you place him in Assigned Risk. However, *285 M?C?A? [sic] will issue a binder on Charles and his car until he can be palced [sic] elswhere. [sic]
Since Jules conducted the entire transaction for Charles, communications to Jules must be considered as notice to Charles. Jules, however, insisted that MCA either put Charles' car back on his wife's policy or write an individual policy. Miller, apparently, agreed with Jules that the binder would continue in force after October 7, its expiration date, and took the binder beyond the 60-day period. However, under date of October 23, 1975 Miller wrote Jules stating that MCA would neither write a policy for Charles nor put him back on his mother's policy, and suggested that Charles' vehicle be put on the "Assigned Risk Plan as soon as possible, since I cannot maintain a binder of coverage longer." Under date of November 5, 1975 Miller again wrote Jules and stated, "I trust you have placed his coverage with the Assigned Risk Plan, since I can no longer bind coverage." During the day of November 28, 1975, Charles came to Miller's office. In the light of the sequel, the interchange between Charles and Miller is dramatic. Miller asked Charles how he got to his office. Charles told him that he had driven to his office. Miller told him that he had no insurance and suggested that Charles leave his automobile where it was and that Miller would drive him home. This Charles refused, but he did pick up an application for the Assigned Risk Plan. It was that night the accident occurred which gives rise to this litigation.
For a time Miller equivocated. Although prior to the expiration of the 60-day period he let it be known that the carrier would not issue a policy, he continued to negotiate with MCA at the request of Jules until the 60-day period had lapsed, assuring Jules that Charles would be covered until he obtained other insurance. Not until November 5, 1975 did he take a definitive position. Nevertheless, it is also the fact that Jules knew prior to the expiration of the 60-day period that MCA would not issue the policy of insurance.
*286 It was conceded that Miller was an agent of MCA. By that was meant that he had authority to issue a binder. It is reasonable to deduce he did not have authority to assign a policy of insurance because the negotiation which ensured after the issuance of the binder concerned the willingness of the carrier to issue the policy.
A "binder" is a temporary policy of insurance, in force until it expires, either by its own terms, by replacement by a permanent policy of insurance, or rejection. Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 301 (1965); Smith & Wallace Co. v. Prussian Ins. Co., 68 N.J.L. 674 (E. & A. 1903); Shannon v. Prudential Ins. Co., 90 N.J. Super. 592, 599 (Law Div. 1966); see Robertson v. Burstein, 104 N.J.L. 218 (Sup.Ct. 1928), rev'd o.g. 105 N.J.L. 375 (E. & A. 1929); "Temporary Insurance", 14 A.L.R.3d 568, § 9 at 599. It may be issued for a period in excess of 60 days. Restaurant Enterprises, Inc. v. Sussex Mut. Ins. Co., 52 N.J. 73 (1968).
A binder is also an agreement that the party covered will accept the insurance policy when issued. Thus, in Smith & Wallace Co., supra, the Court said (68 N.J.L. at 677) "The plaintiff by accepting the binder agreed to be bound by all the terms of the policy, including the rate of premium to be paid * * *." Similarly, in 1 Couch on Insurance (2 ed. 1959), § 14.35, the author says:
Generally speaking, a contract of temporary insurance is subject to the same rules of construction as any ordinary contract of insurance. [at 614]
* * * * * * * *
Ordinarily, the slip or memorandum of temporary insurance does not purport to be a complete statement of the terms of the contract, but leaves some of the terms and conditions to be supplied by reference. It follows that the court is not confined in the construction of the contract to the actual wording of the binding receipt. The binder or receipt binds the insurer according to its terms, and to the extent that they are not set forth, the insurer is bound by the terms and conditions of the policy ordinarily issued by it to insure like risks. If the terms of a standard policy are attached to the binder as a part thereof, the insurance company is liable in accordance therewith. It is also said that the receipt, the *287 application, and the policy are to be considered together as a whole.... [at 615]
The major argument for coverage is that a binder is a kind of insurance policy and therefore is controlled by N.J.S.A. 17:29C-7, which states the circumstances under which an insurance policy may be cancelled. The statute provides:
(A) A notice of cancellation of a policy shall be effective only if it is based on one or more of the following reasons:
(a) Nonpayment of premium; or
(b) The driver's license or motor vehicle registration of the named insured or of any other operator who either resides in the same household or customarily operates an automobile insured under the policy has been under suspension or revocation during the policy period or, if the policy is a renewal, during its policy period.
(B) This section shall not apply to any policy or coverage which has been in effect less than 60 days at the time notice of cancellation is mailed or delivered by the insurer unless it is a renewal policy.
(C) Modification of automobile physical damage coverage by the inclusion of a deductible not exceeding $100.00 shall not be deemed a cancellation of the coverage or of the policy.
(D) This section shall not apply to nonrenewal.
The key element in the statute is that it requires formal[1] notice of cancellation to the insured for nonpayment of premium or suspension or revocation of license after the policy has been in effect for 60 days. It is argued that since the binder was in effect for more than 60 days it could be cancelled only for the reasons stated in the statute. There is no evidence that a premium was billed; certainly, none was paid.
*288 Unfortunately, no statement was annexed to the original bill enacting N.J.S.A. 17:29C-7, and there is no record of legislative debate proceeding its enactment.
Parsing the statute supplies little assistance. N.J.S.A. 17:29C-7(A) makes no reference to binder. It deals only with "cancellation of a policy." Subsection (B) of the same section concerns itself with "policy or coverage * * * in effect less than 60 days * * *." Subsection (C) deals with "[m]odification of automobile physical damage * * * coverage." It is argued that the word "coverage" in subsection (B) includes a "binder," and therefore the provisions as to cancellation of a policy in subsection (A) must be interpreted to refer also to "coverage," so that subsection (A) should be read as "A notice of cancellation of a policy or coverage which includes a binder * * *." (Emphasis supplied). Yet a contrary argument may be made by consideration of subsection (C), which deals with modification of physical damage coverage. The obvious intent under this section is to deal with increases or decreases in the property protected by the insurance policy and not with binders. The unanswered question is whether the Legislature that dealt with policies and coverage intended to leave binders unregulated. The answer must be found in broad rules of statutory interpretation and consideration of state policy in insurance matters, which, in my view, require a finding of coverage.
Guidance in the insurance area can be found in Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co., 52 N.J. 73 (1968), in which N.J.S.A. 17:36-5.16, which in words prohibited fire insurance binders for a period in excess of 60 days, was held not to bar recovery by an insured who had a binder in excess of 60 days. In its opinion the Court said:
Such a result is patently unfair, visiting, at [sic] it does, a penalty upon the insured who has no reason actually to know of the statutory limitation while the insurer who has a duty to know thereof, receives an unjust benefit.
Under such a sanction the insurer can never be harmed by issuing a binder for more than 60 days and the prospective insured, unaware of the statutory *289 limitation, alone can be harmed by accepting it. This result is objectionable because its penalty falls upon the party not intended by the legislature to be penalized. An intention to cause such a result cannot be imputed to the legislature, which is after all presumed to act consonant with reason and good discretion. [at 77]
Accord, Roman v. Sharper, 53 N.J. 338 (1969). In Smith v. Bergen Cty. Bd. of Chosen Freeholders, 139 N.J. Super. 229 (Law Div. 1976), aff'd 146 N.J. Super. 45 (App.Div. 1977), the court said:
We must read legislation sensibly, rather than literally. We must presume a legislative intent consonant to good reason and discretion. We must look to the entire legislative scheme and not become befogged by words  the internal sense makes the law. Any statute must be construed as a whole with reference to the system of which it is a part. [at 237]
Another aspect of the chain of logic which leads to the conclusion that MCA is obligated to defend is the fact that policies of insurance in this State are contracts of adhesion. Where the Legislature provides a statutory policy, policies which provide less protection than the statutory standard are automatically amended to conform with the statute. Motor Club Fire & Cas. Co. v. N.J. Mfrs. Ins. Co., 73 N.J. 425, 435-436 (1977); Herbert L. Farkas Co. v. New York Fire Ins. Co., 5 N.J. 604 (1950); Kish v. Motor Club of America Ins. Co., 108 N.J. Super. 405 (App.Div. 1970), certif. den. 55 N.J. 595, 264 A.2d 68 (1970); Saffore v. Atlantic Cas. Ins. Co., 21 N.J. 300, 121 A.2d 543 (1956). In the case of automobile liability policies, protection of the assured is not the primary object. "A second and more important policy is that of assuring that all persons wrongfully injured have financially responsible persons to look to for damages." Odolecki v. Hartford Acc. & Indem. Co., 55 N.J. 542, 549 (1970). Although the injured party has no direct action against the tortfeasor's carrier until he has obtained a judgment against the tortfeasor (Manukas v. American Ins. Co., 98 N.J. Super. 522 (App.Div. 1968)), where the insurance carrier is joined in the litigation, as here, the interests of the insured party must be considered in resolving the question of coverage to the point *290 that he may have a declaratory judgment on that issue. See Eschle v. Eastern Freightways, 128 N.J. Super. 299, 302, 306-307 (Law Div. 1974).
The Motor Vehicle Security-Responsibility Law (N.J.S.A. 39:6-23 et seq.) shows, at least in the context of that statute, that the Legislature treated a binder as a limited kind of policy. N.J.S.A. 39:6-48 describes the motor vehicle liability policy which may be issued as proof of financial responsibility. Subsection (b) of that section provides:
The policy, any written application therefor and any rider or indorsement which shall not conflict with the provisions of this act shall constitute the entire contract between the parties.
Effective as of the date such proof is furnished and to the extent of the coverage required by this act and to the extent of the limits of liability specified in section twenty-four of this act, any policy of motor vehicle liability insurance furnished as proof of financial responsibility pursuant to section eighteen of this act, either by the filing of a certificate signed by a duly licensed agent of the company issuing the policy as provided in the said section, or otherwise, shall be deemed amended to conform with and to contain all the provisions required by this act, any provision of the policy or certificate to the contrary notwithstanding.
An insurance carrier authorized to issue motor vehicle liability policies as provided for in this act may, pending the issuance of the policy, execute an agreement, to be known as a binder; or may, in lieu of the policy, issue an indorsement to an existing policy, each of which shall be construed to provide indemnity or protection in like manner and to the same extent as the policy. The provisions of said sections twenty-four and twenty-five and this section shall apply to the binders and indorsements. [Emphasis supplied]
Similarly, regulations formulated by the Commissioner of Insurance for the operation of the "Assigned Risk Plan" consider a policy and binder as having a degree of equivalence. N.J.A.C. 11:3-1.19 provides, in part:
* * * * * * * *
(b) A company which has issued a policy or binder under this Plan shall have the right to cancel the insurance by giving notice as required in the policy or binder if the insured:

*291 1. Is not or ceases to be eligible or in good faith entitled to insurance;
* * * * * * * *
In considering what the public policy of the State is, one cannot overlook the fact that it is settled law that policy questions (e.g., Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475 (1961)) and even statutory issues (Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co., supra) are to be construed in favor of, rather than against, coverage.
N.J.S.A. 17:29C-7 is far from clear. Nevertheless, the broad intent of the section to separate commitments for insurance which are over 60 days from those which are less than 60 days is apparent. There is no reason why binders should be treated differently than policies and changes in coverage under policies.
I, therefore, hold that the binder at issue here came within the purview of that section. The consequence of that ruling is that it can be terminated only as set forth in subsection 8 of the statute, which reads in part:
No notice of cancellation of a policy to which section 2 applies shall be effective unless mailed or delivered by the insurer to the named insured at least 20 days prior to the effective date of cancellation, provided, however, that where cancellation is for nonpayment of premium at least 10 days' notice of cancellation accompanied by the reason therefor shall be given.
The appropriate notice was not given in this case. The fact that no premium was paid is no impediment to this ruling; it can be billed or the requirement that MCA defend, conditioned upon payment of the appropriate premium. Cf. Haar v. Allstate Ins. Co., 54 N.J. 287, 307 (1969).
NOTES
[1] In this factual context the required act was purely formal, since it was clear MCA would not issue the policy. Viewed as a contract issue if MCA were obligated to issue the policy, its failure to do so would have required it to respond in damages. "Cancelled Liability Insurance  Remedy," 34 A.L.R.3d 385, § 6 at 393 and § 7 at 394 (1973); Dobbs, Remedies, § 4.8 at 298, n. 37 (1973). This, however, is a far cry from considering the policy as issued.