982 A.2d 1194 (2009)
410 N.J. Super. 453
EPIX HOLDINGS CORPORATION, Plaintiff-Respondent,
v.
MARSH & McLENNAN COMPANIES, INC., Marsh USA Inc., Marsh Inc., Twin City Fire Insurance Company, and Hartford Underwriters Insurance Company, Defendants-Respondents, and
National Union Fire Insurance Company of Pittsburgh, PA, American International Group, Inc., AIG Risk Management, Inc., Defendants-Appellants.
No. A-3059-08T3
Superior Court of New Jersey, Appellate Division.
Argued September 30, 2009.
Decided November 17, 2009.
*1197 Shalom D. Stone and Andrew C. Finch (Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.) of the New York bar, admitted pro hac vice, New York City, argued the cause for appellant (Walder, Hayden & Brogan, Roseland, and Mr. Finch, attorneys; Kenneth A. Gallo of the Washington, D.C. bar, admitted pro hac vice, of counsel; Mr. Stone, on the brief).
Richard A. DeTar (Miles & Stockbridge) of the Maryland bar, admitted pro hac vice, Easton, MD, argued the cause for respondent Epix Holdings Corporation (Palmisano & Goodman, Woodbridge, and Mr. DeTar, attorneys; Robert G. Goodman, Woodbridge, on the brief).
Before Judges CARCHMAN, PARRILLO and LIHOTZ.
The opinion of the court was delivered by
PARRILLO, J.A.D.
This appeal presents issues concerning whether a non-signatory may enforce an arbitration clause in a contract signed by its subsidiary corporation, the scope of that arbitration agreement, and whether, even if included therein, the Legislature nevertheless intended statutory antitrust claims to be non-arbitrable. Defendants National Union Fire Insurance Company of Pittsburg, PA (National Union) and its parent company, American International Group, Inc. (collectively, AIG defendants) appeal the Law Division's order denying AIG defendants' motion to compel arbitration of plaintiff EPIX Holdings Corporation's (EPIX or plaintiff) antitrust and common law claims in a pending lawsuit, based on an arbitration clause in a "Payment Agreement" executed between EPIX and National Union. For the following reasons, we reverse.
EPIX is a professional employer organization (PEO) that contracts with small businesses to provide payroll services and other benefits, including workers' compensation insurance coverage, generally offering lower insurance rates due to the economies of scale attained by pooling many employees into one large group within the *1198 PEO. In September 2000, EPIX retained Marsh & McLennan Companies, Inc.[1] as its exclusive broker-agent and advisor to secure workers' compensation coverage for EPIX and its nearly 50,000 worksite employees and 3,000 small business customers at the best rate and coverage available in the marketplace. During the 2000 and 2001 policy years, EPIX's primary workers' compensation insurance provider was Hartford Underwriters Insurance Company (Hartford). According to EPIX, in June 2002, less than ninety days before their expiration, Hartford unexpectedly gave notice that it was declining to renew its workers' compensation insurance policies with EPIX for the 2002 policy year. With no alternative plan in the works, on July 26, 2002, Marsh finalized negotiations with AIG for EPIX's workers' compensation insurance policy and premium for the 2002 policy year.
Thereafter, on August 29, 2002, AIG Risk Management, Inc. (AIGRM), an AIG subsidiary, issued a Binder Letter to Marsh, and EPIX immediately commenced making payment on the insurance policy that went into effect on September 1, 2002.[2] The document, which was not signed by either EPIX or Marsh, quoted the annual and monthly premiums and provided that payments were due on the fifteenth of each month of the policy year. In addition, the letter included formulas for monthly premium adjustments and loss provision annual adjustments as well as the collateral requirement of $15 million. Further, AIG reserved the right to modify and amend the list of undesirable class codes (of the employees covered under the workers' compensation insurance policy) "on a going forward basis." Significantly, for present purposes, the Binder Letter explicitly required execution of a more detailed Payment Agreement:
You must execute and return an original executed copy of both the Payment Agreement and the Schedule, and any other documents we deem necessary to adequately document the terms of the program, to us at our address shown above within 30 days after the Effective Date above or 30 days after the date of the Underwriter's signature hereon, whichever is later.
Failure to execute the Payment Agreement allowed National Union, with whom AIG placed the insurance policy, to void the "Finance Plan" summarized in the Binder Letter, making the entire amount of the "Estimated Total Cost" immediately due and payable to National Union.
The Payment Agreement was executed by EPIX and National Union, "on behalf of itself and its affiliates," in February 2003, but made effective as of September 2002. The agreement expressly set forth in detail the terms and conditions of EPIX's payment obligation, including the "premiums and premium surcharges" payable for the workers' compensation policies and described the "collateral," including letters of credit, EPIX was required to deliver. In a section entitled "What have you and we agreed to?", the Payment Agreement expressly stated:
We have agreed to the following:
 to provide You insurance and services according to the Policies and other agreements; and
 to extend credit to You by deferring our demand for full payment of the entire amount of Your Payment Obligation if You make partial payments according to this Agreement.

*1199 To induce us to agree as above,

You have agreed to the following:
 to pay us all Your Payment Obligation and to perform all Your other obligations according to this Agreement and Schedule for all entities covered by the Policies.

 to provide us with collateral according to this Agreement and Schedule.

The Payment Agreement also contained an arbitration clause providing:
HOW WILL DISAGREEMENTS BE RESOLVED?
What if we disagree about payment due?
If You disagree with us about any amount of Your Payment Obligation that we have asked You to pay, within the time allowed for payment You must:
 give us written particulars about the items with which You disagree; and
 pay those items with which You do not disagree....
What about disputes other than disputes about payment due?
Any other unresolved dispute arising out of this Agreement must be submitted to arbitration....
The arbitration clause also provides that "arbitration must be governed by the United States Arbitration Act," and that the arbitrators would have "exclusive jurisdiction over the entire matter in dispute, including any question as to arbitrability."
On August 20, 2008, plaintiff sued AIG,[3] National Union, Hartford,[4] and Marsh, alleging various claims arising from this transaction under the New Jersey Antitrust Act, N.J.S.A. 56:9-3including restraint of trade, price-fixing, unfair business practices, civil conspiracy, commercial bribery, and unjust enrichmentas well as common law claims against Marsh for breaches of contract and fiduciary duty, professional negligence, negligent misrepresentation, and fraud.[5] The gravamen of plaintiff's action, as described in the first fifteen paragraphs of its 60-page, 208-paragraph complaint, concerned an alleged elaborate conspiracy among the AIG, Hartford, and Marsh defendants to "manipulate the market for insurance" and rig the bidding on its 2002 and 2003 workers' compensation insurance policies, thereby enabling the AIG defendants to charge "inflated premiums" and impose "onerous terms" "with inadequate coverage." Pursuant to this scheme, Hartford submitted a false and contrived "B quote" in June 2002 "to deceive EPIX into believing the AIG's July 2002 premium quote was fair and reasonable" in comparison. Marsh, acting in concert with AIG and Hartford, obtained Hartford's renewal quote for the 2002 policy year supposedly in exchange for kickbacks that AIG had agreed to pay Marsh pursuant to "a confidential contingent commission agreement" between the three defendants. This scheme was designed "to cause Marsh to steer business to [AIG and Hartford] and not others, and to shield them from fair competition at fair prices in the market *1200 place." Consequently, according to plaintiff, negotiations for the quote were completed on July 26, 2002, resulting in EPIX paying "more in premiums, costs and letters of credit than it would have paid in the absence of this conduct," and thus sustaining "substantial damages." Based on these allegations, plaintiff sought, inter alia, disgorgement "of all premiums paid by EPIX ... over and above the fair and competitive premium price for the [workers' compensation] Insurance provided by AIG to EPIX during this time period."
After answering plaintiff's complaint, AIG moved to compel arbitration, to which EPIX objected. Following argument, the Law Division judge denied the motion, holding that AIG lacked standing to enforce the arbitration clause because it was not a party to the Payment Agreement and that, in any event, EPIX's dispute with defendants was not within the scope of the arbitration clause. We granted AIG's motion for leave to appeal.

I.
Plaintiff argued below that AIG lacked the requisite standing to compel arbitration because AIG was not a party to the Payment Agreement that contained the arbitration clause. In challenging the court's threshold ruling on its lack of standing, AIG now argues that plaintiff should be equitably estopped from avoiding arbitration because its allegations against AIG are intertwined with the Payment Agreement and with plaintiff's allegations against National Union, a signatory to that document, with whom AIG is clearly aligned. We agree.
It is clear that in certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate. Arthur Andersen LLP v. Carlisle, ___ U.S. ___, 129 S.Ct. 1896, 1901, 173 L.Ed.2d 832, 839 (2009); Angrisani v. Fin. Tech. Ventures, L.P., 402 N.J.Super. 138, 154, 952 A.2d 1140 (App.Div.2008); Alfano v. BDO Seidman, LLP, 393 N.J.Super. 560, 569, 925 A.2d 22 (App.Div.2007); Bruno v. Mark MaGrann Assoc., 388 N.J.Super. 539, 548-49, 909 A.2d 768 (App.Div. 2006); Wasserstein v. Kovatch, 261 N.J.Super. 277, 286, 618 A.2d 886 (App. Div.), certif. denied, 133 N.J. 440, 627 A.2d 1145 (1993). Since arbitration agreements are analyzed under traditional principles of state law, such principles "allow a contract to be enforced by or against nonparties to the contract through `assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'...." Arthur Andersen, LLP, supra, 129 S.Ct. at 1902, 173 L.Ed.2d at 840 (internal citations omitted).
New Jersey law recognizes non-signatory standing to compel arbitration based on the principle of equitable estoppel. See Bruno, supra, 388 N.J.Super. at 548, 909 A.2d 768. The estoppel inquiry is fact specific, JLM Indus., Inc. v. Stolt-Nielsen, S.A., 387 F.3d 163, 178 (2d Cir. 2004), but usually involves an analysis of the connection between the claim, the arbitration agreement and the parties. Id. at 177; J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir.1988). Thus, we have recently cited with approval JLM Indus., supra, 387 F.3d at 177-78, which held that a "non-signatory to [an] arbitration agreement may compel [a] signatory to arbitrate when [the] issues to be litigated are intertwined with [the] agreement containing [the] arbitration clause." Bruno, supra, 388 N.J.Super. at 548, 909 A.2d 768.
In Bruno, homebuyers, claiming the heating units in their homes did not work properly, brought a class action suit against the developer, but that suit was dismissed because the parties' contract mandated arbitration. Id. at 542, 909 A.2d *1201 768. The homebuyers then sued the subcontractors with whom they had no contractual relationship. Ibid. We affirmed the Law Division's dismissal of that complaint as well, holding that although the plaintiffs did not have a contractual relationship with the defendant subcontractors, their claims "present the same factual allegations" as against the developer and arise directly out of their contracts with the developer, which contain broad arbitration provisions, and as such "are estopped from avoiding arbitration." Id. at 548, 909 A.2d 768.
Our holding in Bruno is consistent with federal case law interpreting the Federal Arbitration Act (FAA), 9 U.S.C.A. § 1 to -16. See JLM Indus., supra, 387 F.3d at 177-78; Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271 F.3d 403, 406 (2d Cir.2001) (signatory to an arbitration agreement may be estopped from avoiding arbitration with a non-signatory when the issue in dispute between the parties is bound up in a contract containing an arbitration clause); MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999) (signatory may be estopped from denying arbitration when "claims against a nonsignatory make[] reference to or presume[] the existence of the written agreement") (internal citations omitted); McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir.1984) (contractor and project manager with no contractual relationship required to arbitrate their disputes because the claims were "intimately founded in and intertwined with" an underlying contract that contained an arbitration clause) (quoting Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 839, 841 n. 9 (7th Cir.1981) (where plaintiff agreed in a contract with defendant to provide masonry service for construction of two schools, and contract contained arbitration provision, plaintiff was required to arbitrate with subcontractor without a direct contract because plaintiffs claim arose out of contract between plaintiff and general contractor)).
For instance, in JLM, supra, the plaintiffs, who were liquid chemical dealers, entered into various shipping contracts with subsidiaries of the parent parcel tank companies. 387 F.3d at 177. The plaintiffs brought a putative class action suit against the parent/owner shipping companies alleging a conspiracy to fix freight rates for ocean transportation of liquid chemicals via parcel tanks, in violation of the Sherman Antitrust Act. Id. at 168. The court held that the arbitration clauses within the contracts between the plaintiff and the subsidiaries could be enforced by the parent corporations. Id. at 177. In so holding, the court rejected the plaintiffs' counterargument that "the conspiratorial conduct giving rise to the claims in this case was conduct of the parent companies rather than the contracting subsidiaries." Ibid. Rather, the Court reasoned that under principles of estoppel, non-signatory standing to enforce an agreement to arbitrate exists "where a careful review of `the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them disclose that `the issues the non-signatory is seeking to resolve in arbitration are intertwined with that agreement that the estopped party has signed.'" Ibid. (citing Choctaw Generation Ltd. P'ship, supra, 271 F.3d at 406 (holding that the "tight relatedness of the parties, contracts and controversies" was sufficient to estop the party bound by the arbitration clause from avoiding arbitration)); see also Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir.1999) (holding that a party was estopped from avoiding arbitration with a non-signatory because it had treated non-signatory companies and their signatory assignees "as a *1202 single unit" in its complaint in a related lawsuit).
As a matter of both federal and state law, the principle of equitable estoppel has been invoked, under appropriate circumstances, to force an objecting signatory to arbitrate the same claims against a non-signatory as alleged against the other party to the contract. But even where the inextricable connectivity was not considered itself dispositive of the issue, the combination of the requisite nexus of the claim to the contract together with the integral relationship between the non-signatory and the other contracting party was recognized as a sufficient basis to invoke estoppel. Angrisani, supra, 402 N.J.Super. at 154, 952 A.2d 1140. Cf. E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 202 (3d Cir.2001) ("The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged.").
In Angrisani, supra, although we cited the equally controlling principle that "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," 402 N.J.Super. at 143, 952 A.2d 1140, we nevertheless acknowledged those cases in which arbitration was compelled where a non-signatory to the contract is closely aligned to a contracting party, such as a parent or successor corporation, id. at 154, 952 A.2d 1140, or enjoys a principal-agent relationship therewith. Alfano, supra, 393 N.J.Super. at 569, 925 A.2d 22. As to the latter, in Alfano, we required arbitration of an investor's claim against Deutsche Bank AG (DB) and its subsidiary, Deutsche Bank Securities, Inc. (DBSI), pursuant to an arbitration clause in a Customer Account Agreement between the investor and DBSI, on the basis that DBSI was acting as DB's agent and broker in carrying out the transactions with its customer. Id. at 569-70, 925 A.2d 22.
In other cases, courts have compelled arbitration of claims against a non-signatory who is either a parent or successor corporation to a signatory party to an agreement containing an arbitration clause. See, e.g., Sunkist Soft Drinks v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir.1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994) (holding that where the original signatory to a license agreement was later acquired and became a part of the parent corporation and there was a nexus between the plaintiff's claims and the license agreement, the plaintiff was equitably estopped from avoiding arbitration with the parent corporation); Singer v. Commodities Corp., 292 N.J.Super. 391, 411-15, 678 A.2d 1165 (App.Div.1996) (holding that a securities broker who signed an employment agreement under which he was required to submit any employment-related dispute could be compelled to arbitrate an employment-related claim against a successor employer (the parent corporation of the original employer) which had not been a signatory to the agreement containing the arbitration provision).
In yet other cases, courts have concluded that a non-signatory may compel arbitration where the estopped plaintiff either specifically pleaded that the non-signatory and signatories conspired together, Amato v. KPMG, LLP, 433 F.Supp.2d 460, 485-87 (M.D.Pa.2006), vacated in part on other grounds, No. 06cv39, 2006 WL 2376245, 2006 U.S. Dist. Lexis 57091, (M.D.Pa. Aug. 14, 2006), or otherwise treated the non-signatory affiliate of a signatory "as if it were a signatory." Astra Oil Co. v. Rover Navigation, Ltd., 344 F.3d 276, 280 (2d Cir.2003). See also Smith/Enron Cogeneration *1203 Ltd. P'ship, Inc., supra, 198 F.3d at 98 (holding that the party attempting to resist arbitration was estopped from doing so because it had treated arguably non-signatory companies and their signatory assignees "as a single unit" in its complaint in a related lawsuit).
Here, all the factors favoring estoppel are present. AIG, as parent corporation, is clearly aligned to its wholly-owned subsidiary National Union. Moreover, EPIX's claims against AIG are identical to its claims against National Union. Indeed, plaintiff's complaint refers to them collectively and interchangeably,[6] and does not contain a single factual allegation that specifies any acts that were purportedly performed by one and not the other. To the contrary, EPIX alleges that the purported wrongful conduct by AIG resulted in inflated premiums being charged for the workers' compensation insurance provided by National Union, and we find that their conduct is therefore substantially interconnected.
Most significant, EPIX's claims are bound up with the Payment Agreement to which EPIX and National Union are parties. Although explained more fully infra (see Part II at 1204-08), suffice it to say, EPIX's claim against AIG that "its financial instability [was] caused by the [workers' compensation] Insurance coverage terms which required EPIX to pledge substantial cash and letters of credit to [National Union and AIG]," is inextricably intertwined with the Payment Agreement, which defines EPIX's payment obligations, including its obligation to pay the premium and furnish letters of credit. Had EPIX not purchased workers' compensation insurance and entered into the Payment Agreement by which it undertook those payment obligations, no cause of action against the AIG defendants would have arisen. Given the integral relationship between AIG and National Union, the identity of plaintiff's claims against both, and further, the close nexus of plaintiff's claims with the Payment Agreement, we conclude, on the basis of estoppel, that AIG has standing as a non-signatory to compel arbitration of plaintiff's claims against both AIG and National Union.

II.
Having concluded AIG has standing to compel arbitration, we next consider whether plaintiff's price-fixing and related common law claims against AIG and National Union fall within the scope of the arbitration clause of the Payment Agreement. In arguing against enforcement, plaintiff first contends that the operative document is actually the August 26, 2002 Binder Letter, as it establishes the parties' obligations to each other, rather than the February 2003 Payment Agreement, which merely creates an optional finance plan. We disagree.
"[T]he textbook understanding of binder is `[a] temporary contract of insurance. . . intended to give the applicant protection pending the execution and delivery of a formal written policy.'" AGF Marine Aviation & Transp. v. Richard C. Cassin, CIT Group/Sales Fin., Inc., 544 F.3d 255, 261 (3d Cir.2008) (citing 16 Williston on Contracts § 49:53, at 428 (Lord ed., 4th ed. 2000)); see also Miney v. Baum, 170 N.J.Super. 282, 286, 406 A.2d 234 (Law Div.1979). A binder is considered "temporary" or "preliminary" insurance, issued "upon application for insurance or payment of the first premium, which covers the applicant until the insurance company's investigation of his or her *1204 insurability can be completed and a policy issued or the risk refused." 1A Lee R. Russ & Thomas F. Segalia, Couch on Insurance 3d § 13:1, at 13-2 (1995). As such, it is "not [a] complete contract, but evidence of [the] existence of [a] contractual obligation to be expressed in [a] complete written form at [a] later date." 9 Eric M. Holmes, Appleman on Insurance Law & Practice § 55.1 at 227 (2d ed. 1998).
Nor is it an independent, autonomous document that alone is sufficient to establish coverage. Westchester Resco Co. v. New England Reinsurance Corp., 648 F.Supp. 842, 845 (S.D.N.Y.1986). "[R]ather, `the legal rights and duties of the contracting parties that are not covered by the provisions of the binder, or otherwise, must be determined by an inspection of the terms of the written policy which the parties expected would be issued.'" AGF Marine Aviation & Transp., supra, 544 F.3d at 261 (citing Williston § 49:53, supra, at 429); see also Couch § 13:8, supra, at 13-20. Indeed, "[t]he binder merges into the subsequently issued insurance contract; where there is any conflict or ambiguity between the binder and the contract, the latter will govern." Appleman on Insurance, § 55.1, supra, at 232; see also Couch § 13:8, supra, at 13-20.
Here, the Binder Letter, which was not signed by either EPIX or Marsh, its exclusive broker, nor AIGRM or National Union on behalf of the AIG defendants, not only contemplated but expressly required execution of a subsequent Payment Agreement:
You must execute and return an original executed copy of both the Payment Agreement and the Schedule, and any other documents we deem necessary to adequately document the terms of the program. . . .
The Payment Agreement and its attached schedules govern the relationship between insurer and client, provide detailed financial information specific to the client and policy issued, define necessary terms, establish reporting requirements, fix the terms and schedules of payment, specify the consequences of default, and mandate arbitration of disputes. Clearly then, the Binder Letter here, like insurance binders in general, is simply an interim contract, lacking all of the terms of the agreement to insure, and intended to be effective only until execution of the more detailed and complete Payment Agreement.
Having established the Payment Agreement as the operative document, we now address whether its arbitration clause  providing "[a]ny other disputes arising out of this Agreement must be submitted to arbitration"  is broad enough to encompass the disputes here in issue. Initially we note that the Payment Agreement provides that its arbitration clause is governed by the Federal Arbitration Act (FAA), 9 U.S.C.A. § 1 to -16. The FAA, however, "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488, 500 (1989). To ascertain the existence and scope of an agreement to arbitrate, courts apply state contract principles. "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration] Act . . . due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Id. at 475-76, 109 S.Ct. at 1254, 103 L.Ed.2d at 498.
New Jersey codified its endorsement of arbitration agreements in the Arbitration Act, N.J.S.A. 2A:24-1 to -11, now codified as N.J.S.A. 2A:23B-1 to *1205 -32,[7] which, like its federal counterpart, provides that agreements to arbitrate shall be valid save for "such grounds as exist at law or in equity for the revocation of a contract." Hojnowski v. Vans Skate Park, 187 N.J. 323, 342, 901 A.2d 381 (2006) (citing N.J.S.A. 2A:24-1, now codified at N.J.S.A. 2A:23B-6(a)). Embracing the federal policy, New Jersey courts have recognized a "strong public policy favors `arbitration as a means of dispute resolution' and requires `liberal construction of contracts in favor of arbitration.'" Bruno, supra, 388 N.J.Super. at 545, 909 A.2d 768 (citing Young v. The Prudential Ins. Co. of Am., 297 N.J.Super. 605, 617, 688 A.2d 1069 (App.Div.1997), certif. denied, 149 N.J. 408, 694 A.2d 193 (1997)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983). In determining whether a dispute falls within the scope of an arbitration clause, courts operate under a "`presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Caldwell v. KFC Corp., 958 F.Supp. 962, 973 (D.N.J.1997) (citing AT & T Techs. v. Communications Workers, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648, 656 (1986) (internal citation omitted)); see also Alfano, supra, 393 N.J.Super. at 576, 925 A.2d 22 (holding that where there is a broad arbitration provision, "doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration, over litigation.").
Governed by this standard, "when phrases such as `arising under' and `arising out of' appear in arbitration provisions, they are normally given broad construction, and are generally construed to encompass claims going to the formation of the underlying agreements." Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000). See also Bleumer v. Parkway Ins. Co., 277 N.J.Super. 378, 403, 649 A.2d 913 (Law Div.1994) (The arbitration clause "in requiring arbitration of `[a]ny dispute . . . regarding this agreement,' is very broadly worded."). In Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Inc., the court interpreted an arbitration clause applying to disputes "arising out of the agreement" as including "any dispute between the contracting parties that is in any way connected with their contract." 1 F.3d 639, 642 (7th Cir.1993). Such an expansive interpretation is generally given to the phrase "arising out of." Medtronic AVE Inc. v. Cordis Corp., 100 Fed. Appx. 865, 868 (3d Cir.2004).
In fact, EPIX acknowledges the breadth of the instant arbitration clause and even conceded at oral argument that, if contained in the Binder Letter, the clause would have covered the dispute in question. Nevertheless, EPIX maintains that because AIG's alleged wrongful conduct preceded execution of the Payment Agreement, plaintiff's derivative claims do not fall within the scope of the arbitration clause's "arising out of" provision. The motion judge agreed:

*1206 [I]t has nothing to do with the policy. It has nothing to do with the coverage. It has nothing to do with the  with the payments of any of the amounts that were due and owing. . . . The gravamen of the complaint here occurred back in July and August of 2002. Now the contract was retroactive to September 1st, but that was even after this supposedly nefarious conduct took place.
Our standard of review of the applicability and scope of an arbitration agreement is plenary. Harris v. Green Tree Fin. Corp., 183 F.3d 173, 176 (3d Cir.1999). Moreover, in determining the scope of an arbitration agreement, a court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir.1987). If these factual allegations "`touch matters' covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them." Ibid.
On this score, courts have applied broad arbitration clauses to factual scenarios similar to the one at issue in this case. Thus, allegations of antitrust violations and price-fixing have been found to be within the scope of arbitration clauses similarly worded as here. See, e.g., JLM, supra, 387 F.3d at 175-76; Kan. City Urology, P.A. v. United Healthcare Servs., 261 S.W.3d 7, 14 (Mo.Ct.App.2008). For instance, in JLM, supra, the factual allegations involved a conspiracy among parcel tank owners to fix worldwide freight rates for ocean shipping services to plaintiffs, dealers in liquid chemicals. 387 F.3d at 167-68. The plaintiffs in JLM entered into a series of charters or standardized shipping contracts with subsidiaries of the owners, each of which specified price terms that the plaintiffs variously characterized in their class action complaint as "artificially high" and as "over-payment." Id. at 175. Reasoning that the plaintiff dealers could not have suffered their alleged damages if they had not entered into the contract, id. at 175, the court held that "JLM's Sherman Act claims unquestionably involve a core issue of the contracts between the parties[,]" id. at 176, and therefore concluded "that this is a dispute arising out of the charters." Id. at 175.
In Genesco, Inc., supra, 815 F.2d at 848, the court similarly concluded that an alleged conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, was arbitrable. Genesco involved a series of purchase and sale agreements between a clothing manufacturers (Genesco) and two affiliated firms which served as Genesco's fabric suppliers. 815 F.2d at 843. The arbitration clauses at issue provided that claims "arising under" and "arising out of or relating to" the agreements between the parties were subject to arbitration. Ibid. The RICO claim rested upon an alleged conspiracy between an officer of Genesco and the defendant firms wherein the defendants overcharged Genesco over an extended period of time for damaged and obsolete piece goods it had purchased from them under the purchase and sale agreements. Ibid. Finding that the allegations of overcharging and intentional supply of defective goods formed the crux of the plaintiff's suit and related to the agreement between the parties, id. at 846, the court held that the dispute as to the existence of this conspiracy fell within the scope of the applicable arbitration clauses. Id. at 848.
In Kan. City Urology, P.A., supra, area physicians and medical organizations sued Blue Cross and United Healthcare, with whom they entered into contracts setting the rate of reimbursement for physician and medical services, asserting that the defendants had engaged in price-fixing and *1207 monopolization in violation of state antitrust law. 261 S.W.3d at 10. In holding these claims arbitrable, the court reasoned that, although the claimed conspiracy was formed independently of the specific contractual relations between the parties, nonetheless:
the physicians assert that they have suffered damages as a result of the conspiracy, which they would not have suffered had they not agreed to reimbursement contracts with Blue Cross or United Healthcare. Hence, in that regard, the reimbursement rates in the contracts are the illegal action that Blue Cross and United Healthcare allegedly conspired to produce and are enough for us to conclude that the physicians' factual allegations touch matters covered by the parties' contracts.
[Id. at 14.]
The central factual allegation here is that defendants participated in a bid rigging scheme "with the sole purpose of enhancing their respective pecuniary interests," resulting in oppressive terms and inflated premiums charged for the workers' compensation program provided by the AIG defendants, to the detriment of plaintiff, who suffered damages and financial instability therefrom. In our view, the claims the AIG defendants seek to arbitrate not only "arise out of", but are undeniably intertwined with the contract between EPIX and National Union, since it is the fact of EPIX's entry into the contract containing the allegedly inflated price and other oppressive terms that gives rise to the claimed injury. To argue otherwise, as does plaintiff, that its price-fixing claim is not subject to arbitration because defendant's antitrust conduct occurred before execution of, and was therefore independent and distinct from, the February 2003 Payment Agreement, solely misses the point. Simply because the alleged wrongful conduct pre-dates the parties' agreement does not mean that the claimed antitrust injury is unconnected or unrelated thereto. As previously noted, were it not for its contractual relationship with National Union, plaintiff would not have suffered its alleged damages. It is difficult to conceive how plaintiff could maintain its claim for damages without reference to, and reliance upon, the underlying contract. A claim "that draws its very essence from the fact of and performance under the [Agreement] in question . . . necessarily is a claim that arises out of and relates to the Agreement." S+L+H. S.p.A. v. Miller-St. Nazianz, Inc., 988 F.2d 1518, 1524 (7th Cir.1993). Therefore, we conclude plaintiff's claim can fairly be said to "arise out of" the February 2003 Payment Agreement.

III.
Even where statutory claims, as asserted here, fall within the scope of the arbitration clause, we must still determine whether the Legislature intended those claims to be non-arbitrable. That is because an agreement to arbitrate is valid under state law unless it violates public policy. Cohen v. Allstate Ins. Co., 231 N.J.Super. 97, 101, 555 A.2d 21 (App.Div.), certif. denied, 117 N.J. 87, 563 A.2d 846 (1989).
Plaintiff does not argue that its antitrust and restraint of trade claims are per se not subject to arbitration. Rather, plaintiff contends that such claims, at a minimum, require an explicit waiver of its right to pursue its statutory remedy in court, which defendants have failed to demonstrate. However, plaintiff cites nothing in the text of the New Jersey Antitrust Act or in its legislative history that suggests we should treat claims arising thereunder in a manner different than any other claims for purposes of arbitration.
Instead, plaintiff relies exclusively on Garfinkel v. Morristown Obstetrics & Gynecology *1208 Assocs., P.A., 168 N.J. 124, 773 A.2d 665 (2001), an employment case alleging violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to 49, which embodies one of our State's strongest public policies, the eradication of workplace discrimination, Dixon v. Rutgers, The State Univ., 110 N.J. 432, 451, 541 A.2d 1046 (1988), and expressly grants complainants the right to a jury trial. N.J.S.A. 10:5-13. Because the LAD's choice of forum is an integral component of the statute, the Garfinkel Court held that an employee's intent to surrender his or her right to a jury trial in favor or arbitration must be "clearly and unmistakably established." 168 N.J. at 136, 773 A.2d 665 (internal citations omitted). Thus, to pass muster, "a waiver of rights provision should at least provide that the employee agrees to arbitrate all statutory claims arising out of the employment relationship or its termination." Id. at 135, 773 A.2d 665.
We have also recognized, however, that these articulated limits to otherwise broadly-worded arbitration clauses do not apply outside "the special area" of a "plaintiff's enforcement of statutory employment claims." Alfano, supra, 393 N.J.Super. at 576, 925 A.2d 22. Indeed, a party who agrees to arbitrate a statutory claim "does not forgo the substantive rights afforded by the statute; it only submits their resolution in an arbitral, rather than judicial, forum." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444, 456 (1985). In Gilmer v. Interstate/Johnson Lane Corp., the United States Supreme Court recognized that a party will be bound by its agreement to arbitrate unless "Congress itself has evidenced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26, 37 (1991).
As previously noted, courts have consistently recognized that claims under the analogous Sherman Antitrust Act, 15 U.S.C.A. §§ 1-7, are arbitrable. See Mitsubishi Motors Corp., supra, 473 U.S. at 640, 105 S.Ct. at 3360, 87 L.Ed.2d at 463 (holding anti-trust claims arising under the Sherman Act arbitrable); JLM, supra, 387 F.3d at 176 (holding plaintiff's Sherman Act claims arbitrable where they "unquestionably involve . . . allegations that the price terms set for in [the parties'] contracts have been artificially inflated as a result of the price-fixing conspiracy among the Owners"); see also In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F.Supp.2d 1107, 1123-25 (D.Kan.2003) (holding claims made in putative class action lawsuits alleging conspiracy among major providers of telecommunications services to fix "pass-through charges" were referable to arbitration); Acquaire v. Canada Dry Bottling, 906 F.Supp. 819, 836 (E.D.N.Y.1995) (referring to arbitration dispute alleging that major beverage makers sought "to achieve monopoly power in the soft drink and mixer market by fixing prices"). Cf. Caruso v. Ravenswood Developers, Inc., 337 N.J.Super. 499, 508, 767 A.2d 979 (App.Div.2001) (holding that CFA and RICO claims were subject to arbitration.).
Only "if a statute or its legislative history evidences an intention to preclude alternate forms of dispute resolution, will arbitration be an unenforceable option." Alamo Rent A Car, Inc. v. Galarza, 306 N.J.Super. 384, 389, 703 A.2d 961 (App. Div.1997). In Gras v. Assocs. First Capital Corp., we found nothing in the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -106, that precluded vindication of a consumer's statutory rights in the arbitral forum. 346 N.J.Super. 42, 52, 786 A.2d 886 (App.Div.2001), certif. denied, 171 N.J. 445, 794 A.2d 184 *1209 (2002). In finding such claims arbitrable, we found no inherent conflict between the CFA's underlying public policy "to root out consumer fraud," and the "competing and compelling public policy favoring arbitration as a means of dispute resolution and requiring liberal construction of contracts in favor of arbitration." Id. at 53-54, 786 A.2d 886. But see Rockel v. Dodge, 368 N.J.Super. 577, 580-81, 847 A.2d 621 (App. Div.) (concluding the public policy concerns under the CFA outweighed the public policy favoring arbitrations as a dispute resolution process, in a case involving an arbitration provision that was "highly ambiguous," provided "conflicting descriptions of the manner and procedure which would govern the arbitration proceeding" and lacked a waiver of plaintiff's statutory rights), certif. denied, 181 N.J. 545, 859 A.2d 689 (2004).
Our Antitrust Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J.S.A. 56:9-3. Although its legislative history is sparse, Kimmelman v. Henkels, 108 N.J. 123, 129, 527 A.2d 1368 (1987), the Act's full title lends insight into its underlying policy:
An Act to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for profit pursuits, and making an appropriation therefore.
[L. 1970, c. 73]
In other words, the purpose of the Antitrust Act "is the prevention of trade-restraining practices which have tendency to deprive the public of benefits ordinarily derived from a competitive market." Boardwalk Properties, Inc. v. BPHC Acquisition, Inc., 253 N.J.Super. 515, 530, 602 A.2d 733 (App.Div.1991).
We perceive nothing in the text of the Act or its scant legislative history which suggests the Legislature intended to preclude arbitration of claims thereunder without a clear and explicit waiver of the right to judicial adjudication.[8] On the contrary, while a "private litigant may financially gain from suit under the statute, the overriding purpose of the Act is to advance public policy in favor of competition." Boardwalk Properties, supra, 253 N.J.Super. at 530, 602 A.2d 733. In fact, unlike the LAD cases where the right to jury trial was essential to the Court's requiring a clear and express waiver thereof before submitting the matter to arbitration, Quigley v. KPMG Peat Marwick, LLP, 330 N.J.Super. 252, 267, 749 A.2d 405 (App.Div.2000), the Antitrust "Act omits any reference to a jury trial." Boardwalk Properties, supra, 253 N.J.Super. at 529, 602 A.2d 733. We found such an omission to be "`highly indicative of legislative intent not to confer such a right' in view of our Legislature's practice of expressly providing for jury trials when such is intended." Ibid. (citing Shaner v. Horizon Bancorp., 116 N.J. 433, 443, 561 A.2d 1130 (1989)). Accordingly, in the absence of any right to a jury trial, or other indication in New Jersey's Antitrust Act to the contrary, we conclude that plaintiff may effectively vindicate its statutory cause of action and related common law claims against the AIG defendants in the *1210 arbitral forum without an express and specific waiver of its right to judicial adjudication.

IV.
Because arbitration will not conclude the entire litigation, and its claims against Marsh and Hartford will remain pending in the Law Division, plaintiff argues against arbitration of its claims against the AIG defendants, lest it be forced to litigate in two different forums. However, we do not view this possibility as a bar to the grant of defendants' motion to compel arbitration.
The arbitration clause at issue is expressly governed by the FAA, and federal law "requires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Mem'l Hosp., supra, 460 U.S. at 20, 103 S.Ct. at 939, 74 L.Ed.2d at 782 (emphasis added). Under the FAA, "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." Ibid.; see also Barrowclough v. Kidder, Peabody & Co., 752 F.2d 923, 938 (3d Cir.1985), overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110 (3d Cir.1993). Accordingly, "the Arbitration Act requires district courts to compel arbitration . . . when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158, 163 (1985). We conclude that the possible inconvenience to plaintiff is not a sufficiently compelling ground to overcome New Jersey's strong public policy favoring arbitration where the parties have expressly agreed to this method of dispute resolution.
Although we "look with disfavor upon the unnecessary bifurcation of disputes between judicial resolution and arbitration," Garfinkel, supra, 168 N.J. at 137, 773 A.2d 665 (quoting Ohio Cas. & Ins. Co. v. Benson, 87 N.J. 191, 199, 432 A.2d 905 (1981)) (emphasis added),[9] the parties explicit agreement to arbitrate in this case makes bifurcation necessary. Indeed, our courts have routinely permitted litigation in separate forums where a plaintiff alleges claims against multiple defendants, some of whom have agreed to arbitrate their disputes and others have not, even where common questions of law and fact create significant overlap.[10]
For example, in Alfano, supra, a plaintiff investor sued his accountants, advisors, attorney and the entity in which he made the investment alleging fraud, malpractice, negligence and RICO violations, and seeking damages arising from defendants' promotion and implementation of a tax strategy that caused him to expend excessive fees and to incur an income tax liability. 393 N.J.Super. at 564-65, 925 A.2d 22. The plaintiff had entered into a Customer *1211 Account Agreement with a subsidiary of Deutsche Bank AG (DB), acting as its agent in brokering the transaction wherein the plaintiff agreed to borrow funds from DB and then buy stocks and options in DB, for which he would realize more than $100 million loss to offset the gain realized from the sale of his business. Ibid. The Customer Account Agreement contained an arbitration clause, which the trial judge declined to enforce because DB was not a signatory to the agreement. Ibid. We reversed and ordered arbitration of the dispute between the plaintiff and DB, while staying the remainder of the Law Division action pending the arbitration. Id. at 577-78, 925 A.2d 22.
In Angrisani, supra, the plaintiff entered into two agreements. One was a stock purchase agreement with Investor Financial Technology Ventures, L.P. (FT Ventures) and other investors to purchase the stock in the predecessor company of his employer, Nexxar Group, Inc. (Nexxar). That agreement did not contain an arbitration clause. 402 N.J.Super. at 143-47, 952 A.2d 1140. The other contract was an employment agreement with Nexxar, under which the plaintiff was employed as its president and chief executive officer. Id. at 143, 952 A.2d 1140. The employment agreement contained an arbitration clause. Id. at 143-44, 952 A.2d 1140. Alleging that FT Ventures subsequently caused Nexxar to terminate him, the plaintiff sued both, asserting claims against FT Ventures for fraudulent misrepresentations and tortious interference with his employment contact with Nexxar, and against Nexxar for breach of contract and the duty of good faith and fair dealing. Id. at 144-46, 952 A.2d 1140. Both defendants moved to compel arbitration and the trial court granted the motion. Id. at 146, 952 A.2d 1140. Holding that a plaintiff may be required to arbitrate only those claims he has agreed to submit to arbitration, we affirmed the dismissal of the plaintiff's claims against Nexxar, which we deemed to be arbitrable, but reversed as to the claims against FT Ventures, which we remanded to the trial court. Id. at 156, 952 A.2d 1140. See also Indus. Elecs. Corp. of Wis. v. iPower Distrib. Group, Inc., 215 F.3d 677, 681 (7th Cir. 2000) (holding that "[a] dispute that arises under one agreement may be litigated notwithstanding a mandatory arbitration clause in a second agreement, even where the two agreements are closely intertwined"); Bouriez v. Carnegie Mellon Univ., 359 F.3d 292, 295 (3d Cir.2004) (same).
For these reasons, we conclude that the bifurcation of claims in this case is necessitated by the arbitration clause in the Payment Agreement, which binds EPIX and the AIG defendants. We reverse the order of the Law Division denying the AIG defendants' motion to compel arbitration of plaintiff's claims against them and remand the case to the trial court for a determination whether to stay the remainder of the matter pending arbitration.
Reversed and remanded.
NOTES
[1] Related affiliates are Marsh USA, Inc. and Marsh, Inc., and all will be collectively referred to as "Marsh."
[2] A Binder Letter was issued on August 29, 2003, for the 2003 policy year.
[3] In its second amended complaint filed on February 5, 2009, EPIX added AIGRM as a co-defendant. AIGRM, AIG, and National Union are referred to collectively as AIG defendants. As AIGRM was not yet a party to the action, no mention of AIGRM is made in AIG's and National Union's motion to compel arbitration to the Law Division. There is no information on the record that AIGRM joined the AIG defendant's motion to compel arbitration on the present appeal.
[4] Plaintiff also named as a defendant Twin City Fire Insurance Company, which is referred to collectively as Hartford.
[5] In addition to its statutory claims against AIG, National Union, and Hartford, plaintiff also alleged these defendants aided and abetted Marsh in its fraudulent conduct and breach of fiduciary duty.
[6] See, e.g., paragraph 2 of plaintiff's second amended complaint ("Defendants individually and collectively participated in a bid rigging scheme . . . with the sole purpose of enhancing their respective pecuniary interests.").
[7] The 2003 Arbitration Act, N.J.S.A. 23B-1 to -32, "continues our State's long-standing policy to favor voluntary arbitration as a means of dispute resolution." Block v. Plosia, 390 N.J.Super. 543, 551, 916 A.2d 475 (App. Div.2007); see also Kimm v. Blisset, LLC, 388 N.J.Super. 14, 28-32, 905 A.2d 887 (App.Div. 2006), certif. denied, 189 N.J. 428, 915 A.2d 1051 (2007).
[8] Further, there is nothing in New Jersey's predecessor Arbitration Act, N.J.S.A. 2A:24-3, which "restrict[s] the type of agreement subject to arbitration." Alamo, supra, 306 N.J.Super. at 389, 703 A.2d 961.
[9] The Garfinkel Court made this observation in the context of finding no express waiver of the right to a jury trial of the plaintiff's LAD claims and therefore ordered that the complainant's related common law claims should be joined therewith in a single Law Division action. 168 N.J. at 136-37, 773 A.2d 665.
[10] As the Supreme Court has noted: "[i]n some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration." Moses, supra, 460 U.S. at 20 n. 23, 103 S.Ct. at 939, 74 L.Ed.2d at 782 (citing Landis v. North American Co., 299 U.S. 248, 254-255, 57 S.Ct. 163, 166, 81 L.Ed. 153, 158-59 (1936)). Despite this possibility, the propriety of such a stay as between the plaintiff and defendants Marsh and Hartford is not before us in this appeal. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).