952 A.2d 1140

FRANK ANGRISANI, PLAINTIFF–APPELLANT, v. FINANCIAL TECHNOLOGY VENTURES, L.P. AND NEXXAR GROUP, INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 22, 2008—Decided August 7, 2008.

140

Before Judges SKILLMAN, WINKELSTEIN and LeWINN.

*Laurence B. Orloff,* argued the cause for appellant (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys; *Mr. Orloff,* of counsel and on the brief; *Lindsay F. Ditlow,* on the brief).

*Elizabeth L. Deeley* (*Kirkland & Ellis*) of the California bar, admitted pro hac vice, argued the cause for respondents (*Morgan, Lewis & Bockius, Ms. Deeley* and *James F. Basile* (*Kirkland & Ellis*) of the California bar, admitted pro hac vice, attorneys; *Richard G. Rosenblatt, James P. Walsh, Jr., Ms. Deeley* and *Mr. Basile,* of counsel and on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

Plaintiff entered into an agreement with the predecessor to defendant Nexxar Group, Inc. (Nexxar) under which he was employed as its President and Chief Executive Officer. Plaintiff also entered into an agreement with defendant Financial Technology Ventures, L.P. (FT Ventures) and other investors for the purchase of stock in Nexxar's predecessor. Plaintiff's employment agreement with Nexxar contains a provision for arbitration

of disputes. Plaintiff's stock purchase agreement with FT Ventures does not contain any arbitration provision. In this action, plaintiff asserts claims against both Nexxar and FT Ventures. The primary issue presented by the appeal is whether plaintiff may be forced to arbitrate his claims against FT Ventures, even though his agreement with FT Ventures does not provide for arbitration, because those claims are allegedly intertwined with and dependent upon his employment agreement with Nexxar. We conclude that plaintiff may be required to arbitrate only those claims that he has specifically agreed to submit to arbitration, and that the omission of any provision for arbitration in the stock purchase agreement with FT Ventures and other investors shows that plaintiff did not agree to arbitrate any claims he might assert against FT Ventures.

Plaintiff, an experienced businessman, developed a plan for formation of a worldwide money transfer company that would engage in the transfer of funds from residents of one country to residents of another country for family, business and other purposes. One part of plaintiff's plan involved acquisition of existing companies engaged in the money transfer business.[1]

To undertake this plan, plaintiff formed a wholly-owned corporation, Axxa Group, Inc. (AGI), in which he deposited his intellectual property and related business plan information. The implementation of plaintiff's plan required him to raise between $50 and $200 million in capital. To raise this money, plaintiff sought venture capital partners.

In June 2003, plaintiff entered into an agreement with defendant FT Ventures, which had preexisting relationships with global banking institutions and knowledge of the money transfer industry, to invest sufficient money in AGI to implement part of his

---

[1] Because plaintiff's complaint was dismissed before any substantial discovery was undertaken, the facts set forth in this opinion are taken primarily from the allegations of plaintiff's complaint. Although some of those allegations are denied, there is no factual dispute material to the issues presented by this appeal.

business plan. FT Ventures agreed that plaintiff would continue to serve as CEO, President and a member of AGI's Board of Directors. Plaintiff and FT Ventures initially executed a "term sheet" to reflect the terms of their joint venture agreement.

Shortly thereafter, FT Ventures pursued negotiations for acquisition of Uno Money Transfer Co. (Uno), a Brazilian money transfer company. The acquisition of Uno was apparently finalized at the same time that plaintiff, AGI and FT Ventures formalized the arrangements set forth in the term sheet by the execution on November 25, 2003 of the two agreements around which this appeal revolves.

The first was an agreement for the purchase of stock in AGI, which at that time was renamed Tri–Axxa and later renamed Nexxar. The signatories to the stock purchase agreement were not only plaintiff and Nexxar's predecessor Tri–Axxa but also FT Ventures and three other investors in the corporation. This agreement did not contain any provision for arbitration of disputes that might arise thereunder.

The second was an agreement by Nexxar's predecessor Tri–Axxa to employ plaintiff as its President and CEO. The only signatories to the employment agreement were plaintiff and the corporation. This agreement contained a provision for arbitration of any dispute between the parties, the specific terms of which are quoted and discussed later in this opinion.

Plaintiff's complaint alleges that after the execution of the stock purchase and employment agreements, he became aware "for the first time that Uno's transactions and processes originating in Brazil and resulting in the transfer of funds out of Brazil, were in violation of Brazilian law and might also be in violation of United States law." The complaint further alleges that "FT Ventures had been advised by its counsel in 2003 in connection with its due diligence investigation of Uno, that the Brazilian northbound traffic of Uno could be illegal and that FT Ventures should seek an opinion of Brazilian counsel on the issue[,]" but that "FT Ventures had apparently chosen to disregard its counsel's advice

and rather to rely upon representations and warranties by Uno that its procedures were in compliance with Brazilian law." Plaintiff alleges that he confronted the FT Ventures's representatives on the Nexxar board of directors with this information and demanded that they disclose the information to other board members. However, according to plaintiff, FT Ventures refused to do this and subsequently caused the Nexxar board first to suspend and later to terminate him from his position as President and CEO of Nexxar.

Based on these factual allegations, plaintiff asserted claims against FT Ventures for fraudulent misrepresentations, intentional omission or concealment, negligent misrepresentation, breach of contract and the duty of good faith and fair dealing, and tortious interference with his employment contract with Nexxar. Plaintiff's complaint also asserted a claim against Nexxar for breach of contract and the duty of good faith and fair dealing. Plaintiff demanded a jury trial on his claims.

In addition to this complaint, plaintiff filed a second action against Nexxar and members of its board of directors, asserting a claim under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –14, based on his allegation that Nexxar terminated him in retaliation for his actions regarding the illegality of Uno's business operations.

Defendants filed a motion in the present action to strike plaintiff's demand for a jury trial. The trial court granted this motion as to Nexxar but denied it as to FT Ventures.

Defendants subsequently filed a motion to compel arbitration of plaintiff's claims against both Nexxar and FT Ventures. The trial court issued an oral opinion granting this motion. Although only the employment agreement between plaintiff and Nexxar contained an arbitration provision, the court concluded that plaintiff was "equitably estopped" from refusing also to arbitrate his claims against FT Ventures because "there is a substantial intertwining of the wrongs and a tangible but-for connectivity" between those claims and the employment agreement. Accordingly, the court

ruled that plaintiff was required to submit all of his claims against both Nexxar and FT Ventures to arbitration and dismissed the complaint without prejudice. We granted plaintiff's motion for leave to appeal from the order memorializing this ruling.[2]

The trial court also granted Nexxar's motion to compel arbitration of plaintiff's CEPA claim. Plaintiff did not appeal from the dismissal of that action.

In this appeal, plaintiff argues that even if his claims against Nexxar fall within the arbitration provision of the employment agreement, Nexxar either waived or is judicially estopped from asserting its right to compel arbitration of those claims. Plaintiff also argues that his claims against FT Ventures do not fall within the arbitration provision of the employment agreement, and that the trial court erred in ruling that he was equitably estopped from refusing to arbitrate those claims because they are intertwined with and dependent upon the employment agreement.

We conclude that plaintiff's claims against Nexxar fall within the arbitration provision of his employment agreement and that Nexxar is not foreclosed by a waiver or judicial estoppel from compelling plaintiff to arbitrate those claims. However, plaintiff's claims against FT Ventures are not covered by the arbitration provision, and plaintiff may not be compelled to arbitrate those claims because the stock purchase agreement he entered into with FT Ventures and other investors does not provide for arbitration.

I

Preliminarily, we note that even though plaintiff's claims fall under the Federal Arbitration Act (FAA), 9 *U.S.C.A.* §§ 1–16, because the employment and stock purchase agreements are both "contract[s] evidencing a transaction involving commerce[,]" 9

---

[2] Subsequent to our grant of leave to appeal, the Supreme Court held in *Wein v. Morris*, 194 *N.J.* 364, 377–80, 944 *A.*2d 642 (2008), that any order dismissing a complaint on the ground that the claims asserted thereunder must be submitted to arbitration is a final judgment that is appealable as of right.

*U.S.C.A.* § 2 (1994), the issues presented by this appeal are governed by state law. *See Allied–Bruce Terminix Cos., Inc. v. Dobson,* 513 *U.S.* 265, 281, 115 *S.Ct.* 834, 843, 130 *L.Ed.*2d 753, 769 (1995). Congress's objective in enacting the FAA in 1925 was "to abrogate the then-existing common law rule disfavoring arbitration agreements 'and to place arbitration agreements upon the same footing as other contracts.'" *Martindale v. Sandvik, Inc.,* 173 *N.J.* 76, 84, 800 *A.*2d 872 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 *U.S.* 20, 24, 111 *S.Ct.* 1647, 1651, 114 *L.Ed.*2d 26, 36 (1991)). Thus, "the FAA does not require parties to arbitrate when they have not agreed to do so, . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement[.]" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 *U.S.* 468, 478, 109 *S.Ct.* 1248, 1255, 103 *L.Ed.*2d 488, 499 (1989). "It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Id.* at 478, 109 *S.Ct.* at 1255, 103 *L.Ed.*2d at 500. Consequently, in interpreting an arbitration agreement subject to the FAA, a court applies "general state-law principles of contract interpretation[,]" but must give "due regard . . . to the federal policy favoring arbitration[.]" *Id.* at 475–76, 109 *S.Ct.* at 1254, 103 *L.Ed.*2d at 498.

 Under New Jersey law, arbitration is also "favored . . . as a means of resolving disputes[,]" *Martindale, supra,* 173 *N.J.* at 84, 800 *A.*2d 872, and for this reason "[a]n agreement to arbitrate should be read liberally in favor of arbitration[,]" *Marchak v. Claridge Commons, Inc.,* 134 *N.J.* 275, 282, 633 *A.*2d 531 (1993). Therefore, there is no material difference between the approach to the interpretation of arbitration agreements mandated by the FAA and the approach our courts have taken as a matter of State law even when the FAA does not apply.

 As a matter of both federal and state law, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."

*AT & T Techs. v. Commc'n Workers of Am.*, 475 *U.S.* 643, 648, 106 *S.Ct.* 1415, 1418, 89 *L.Ed.*2d 648, 655 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 *U.S.* 574, 582, 80 *S.Ct.* 1347, 1353, 4 *L.Ed.*2d 1409, 1417 (1960)). Therefore, "a 'court may not rewrite a contract to broaden the scope of arbitration[.]' " *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.*, 168 *N.J.* 124, 132, 773 *A.*2d 665 (2001) (quoting *Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc.*, 240 *N.J.Super.* 370, 374, 573 *A.*2d 484 (App.Div.1990)). "[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration[.]" *First Options of Chicago, Inc. v. Kaplan*, 514 *U.S.* 938, 945, 115 *S.Ct.* 1920, 1925, 131 *L.Ed.*2d 985, 994 (1995).

In determining whether a particular dispute is encompassed by an arbitration provision, as in construing any other contractual provision, a court's "goal is to discover the intention of the parties[,]" which requires consideration of the "contractual terms, the surrounding circumstances, and the purpose of the contract." *Marchak, supra,* 134 *N.J.* at 282, 633 *A.*2d 531.

## II

With these general principles in mind, we first consider whether plaintiff's claims against Nexxar for breach of contract and the duty of good faith and fair dealing fall within the arbitration provision of the employment agreement. This provision states:

> [Plaintiff] and [Nexxar] will arbitrate any and all controversies, claims or disputes arising out of or relating to this Agreement or the Executive's employment with the Company ("Claims") before the American Arbitration Association ("AAA") in accordance with the AAA's National Rules for the Resolution of Employment Disputes.

This provision is extremely broad. It requires plaintiff and Nexxar to arbitrate "any and all ... claims ... arising out of or relating to" the employment agreement or plaintiff's employment. Count IV of plaintiff's complaint alleges in pertinent part that "[d]efendant FT Ventures and [Nexxar] contracted with plaintiff

in November, 2003, to provide him with substantial benefits and opportunities, both as President and CEO of [Nexxar] and as an Investor in [Nexxar]" and that defendants' failure to advise plaintiff of the questions raised by FT Venture's own counsel regarding Uno's business operations constituted a "breach of contract" and violated the "obligation of good faith and fair dealing." Although the complaint is unclear, the contract that Nexxar allegedly breached has to have been the employment agreement because Nexxar could not have committed the alleged wrongdoing regarding the stock purchase agreement. This wrongdoing consisted of FT Ventures's failure to inform plaintiff of the possible illegality of Uno's business practices before he executed the stock purchase agreement. Nexxar could not be liable for this wrongdoing because, until the stock purchase agreement was executed, Nexxar was wholly-owned by plaintiff. Therefore, the claims plaintiff asserts against Nexxar in count IV of his complaint "aris[e] out of" or are "relat[ed] to" the employment agreement and are thus required to be arbitrated. *See Medtronic AVE, Inc. v. Cordis Corp.,* 100 *Fed.Appx.* 865, 867–68 (3d Cir.2004); *Martindale, supra,* 173 *N.J.* at 96, 800 *A.*2d 872.

We reject plaintiff's arguments that Nexxar either waived or is judicially estopped from asserting its right to compel arbitration. These arguments are based on the fact that Nexxar moved successfully to strike plaintiff's demand for a jury trial before moving to compel arbitration.

A waiver of a right to arbitration based on a delay in seeking that relief will be found only if that delay has resulted in demonstrable prejudice to the party opposing arbitration. *See Hudik–Ross, Inc. v. 1530 Palisade Ave. Corp.,* 131 *N.J.Super.* 159, 167, 329 *A.*2d 70 (App.Div.1974). Such prejudice cannot be found here because defendants' motion to strike plaintiff's jury demand specifically indicated that defendants would be moving to compel arbitration and, except for opposing defendants' motion to strike his jury demand, plaintiff did not actively litigate this case during

the four-month interval between the filing of his complaint and the filing of defendants' motion to compel arbitration.

Judicial estoppel may be invoked "only when a party advocates a position *contrary to* a position it successfully asserted in the same or a prior proceeding." *Ali v. Rutgers,* 166 *N.J.* 280, 287, 765 *A.*2d 714 (2000) (emphasis added) (quoting *Kimball Int'l, Inc. v. Northfield Metal Prods.,* 334 *N.J.Super.* 596, 606, 760 *A.*2d 794 (App.Div.2000), *certif. denied,* 167 *N.J.* 88, 769 *A.*2d 1051 (2001)). Nexxar's motion to dismiss plaintiff's complaint on the ground that his claims were required to be arbitrated was not "contrary to" its motion to strike plaintiff's jury demand. In fact, the two motions were fully consistent because Nexxar relied upon the same section of employment agreement and presented similar arguments in support of both motions.

Therefore, the trial court correctly compelled plaintiff to arbitrate his claims against Nexxar.

### III

We next consider whether plaintiff's claims against FT Ventures fall within the arbitration provision of the employment agreement. Initially, we note that most of plaintiff's claims are based primarily on the stock purchase agreement rather than the employment agreement. The first three counts of plaintiff's complaint, which assert claims for fraudulent misrepresentation, intentional omission or concealment and negligent misrepresentation, all rest on allegations that FT Ventures failed to disclose to plaintiff and the other investors who signed the stock purchase agreement that FT Venture's counsel had raised questions about the legality of Uno's business operations. Therefore, those counts would be maintainable even if plaintiff had not also entered into an employment agreement with Nexxar. The fourth count, which asserts claims against FT Ventures for breach of contract and the duty of good faith and fair dealing, is clearly based on the stock purchase agreement because that was the only contract plaintiff entered into with FT Ventures. Plaintiff's only claim against FT

Ventures that is directly related to the employment agreement is the tortious interference with contractual relations claim asserted in count V, because that claim is based on an allegation that FT Ventures caused Nexxar to terminate plaintiff's employment as its CEO and President.

In any event, regardless of the relationship between plaintiff's claims and the employment agreement, we do not believe that agreement can be reasonably construed to impose an obligation upon plaintiff to arbitrate any claim against FT Ventures. On the same day plaintiff entered into the employment agreement with Nexxar, he also entered into the stock purchase agreement with FT Ventures. Thus, plaintiff's sole contractual relationship with FT Ventures was the one spelled out in the stock purchase agreement, and that agreement did not contain any provision for arbitration of disputes between the contracting parties. It seems clear, therefore, that plaintiff could not have forced FT Ventures to arbitrate any claim that FT Ventures may have asserted against him. Similarly, we conclude that the employment agreement plaintiff entered into with Nexxar cannot be read to impose an obligation upon plaintiff to arbitrate any claim he might have against FT Ventures simply because that claim has some relationship to the employment agreement.

The conclusion that plaintiff and FT Ventures, as parties to the stock purchase agreement, did not agree to subject any disputes arising thereunder to the arbitration provision of the employment agreement is supported by the different provisions of the two agreements regarding choice of law. The employment agreement states that it shall be "governed and construed" under New Jersey law, while the stock purchase agreement, which is the only agreement entered into by FT Ventures, states that it shall be "governed and construed" under Delaware law. Thus, even though there was a relationship between the employment and stock purchase agreements, the parties contemplated that each agreement would be construed and applied independently based on its own provisions and different laws.

Our conclusion that plaintiff agreed to arbitrate solely employment-related disputes with Nexxar, and not the claims he asserts against FT Ventures, is reinforced by the fact that the arbitration provision in the employment agreement specifically states that arbitration thereunder shall be governed by "the AAA's rules for the Resolution of Employment Disputes." Those rules clearly would not be suitable for the resolution of plaintiff's commercial fraud and other tort and contract claims against FT Ventures.

## IV

We turn finally to FT Ventures's argument, which the trial court adopted, that even if the employment agreement cannot be read to impose an obligation upon plaintiff to arbitrate his claims against FT Ventures, plaintiff is "equitably estopped" from refusing to arbitrate those claims because they are intertwined with and dependent upon the employment agreement. Under New Jersey law, "to establish equitable estoppel, [the party relying upon this doctrine] must show that [the other party] engaged in conduct, either intentionally or under circumstances that induced reliance, and that [the party relying upon the doctrine] acted or changed [its] position to [its] detriment." *Knorr v. Smeal*, 178 *N.J.* 169, 178, 836 *A.*2d 794 (2003). "The doctrine is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." *Ibid.*

Plaintiff did not engage in any course of conduct that could support a finding of equitable estoppel under this conception of the doctrine. He simply entered into two contracts, one with Nexxar that provided for arbitration of disputes, and the other with FT Ventures that did not contain any provision for arbitration, and when disputes arose regarding his rights under the contracts, he asserted claims against FT Ventures in a judicial forum, as he was permitted to do under the stock purchase agreement.

In support of its equitable estoppel argument, FT Ventures relies upon a line of decisions by federal circuit courts of appeals that, according to FT Ventures, stand for the proposition that "claims . . . 'inextricably intertwined' with [a] contract containing [an] arbitration clause" must be arbitrated. If the cases relied upon by FT Ventures actually held that a party to a contract containing an arbitration clause could be forced to arbitrate a claim against a non-signatory to the contract simply because his claim was "inextricably intertwined" with that contract, those cases could not be reconciled with the fundamental principle that "a party can be forced to arbitrate only those issues it has specifically agreed to submit to arbitration[.]" *First Options, supra,* 514 *U.S.* at 945, 115 *S.Ct.* at 1925, 131 *L.Ed.*2d at 994. However, those cases, with the possible exception of *Grigson v. Creative Artists Agency, L.L.C.,* 210 *F.*3d 524 (5th Cir.), *cert. denied,* 531 *U.S.* 1013, 121 *S.Ct.* 570, 148 *L.Ed.*2d 488 (2000), do not stand for the broad proposition that a party can be forced to arbitrate a claim that he has not agreed to arbitrate based solely on that claim's relationship to an agreement containing an arbitration provision. Instead, those cases generally involve situations where a party to a contract containing an arbitration clause seeks to bring an action based on the contract against a non-signatory to the contract that is closely aligned to a contracting party, such as a parent or successor corporation.

For example, in *Sunkist Soft Drinks v. Sunkist Growers, Inc.,* 10 *F.*3d 753 (11th Cir.1993), *cert. denied,* 513 *U.S.* 869, 115 *S.Ct.* 190, 130 *L.Ed.*2d 123 (1994), Sunkist and SSD entered into a license agreement that contained an arbitration clause. Del Monte subsequently acquired SSD. Sunkist brought an action against Del Monte alleging that Del Monte had interfered with Sunkist's license agreement with SSD. The court held that even though Del Monte was not a party to the licensing agreement, it could compel Sunkist to arbitrate its claims, on the basis of equitable estoppel, because those claims presumed the existence of and relied upon the licensing agreement. *Id.* at 758. Moreover, after acquiring SSD, Del Monte ceased operating it as an indepen-

dent enterprise and SSD became a part of Del Monte. *Id.* at 755. Therefore, the court concluded, based on "[t]he nexus between Sunkist's claims and the license agreement, as well as the integral relationship between SSD and Del Monte," that "Sunkist is equitably estopped from avoiding arbitration of its claims." *Id.* at 758.

Although the court in *Sunkist* rested its decision on the doctrine of equitable estoppel, it could just as easily have concluded that Sunkist, by entering into a license agreement with an arbitration clause, impliedly agreed to arbitrate any claim arising under that agreement, regardless of whether that claim was against the other party to the agreement or an alleged successor to its obligations under the agreement. *See Grigson, supra,* 210 *F.*3d at 533 (Dennis, J., dissenting) (observing that "the bases of fact and reasoning upon which the courts in [*Sunkist* and the majority of the other cases relied upon by FT Ventures] ordered a signatory to an arbitration agreement to arbitrate a dispute with a non-signatory have the earmarks of a foundation for an agreement implied in fact rather than an ordinary equitable or promissory estoppel."). In fact, this was the approach we followed in *Singer v. Commodities Corp.,* 292 *N.J.Super.* 391, 411–15, 678 *A.*2d 1165 (App.Div.1996), in holding that a securities broker who signed an employment agreement under which he was required to submit any employment-related dispute to arbitration could be compelled to arbitrate an employment-related claim against a successor employer (the parent corporation of the original employer) which had not been a signatory to the agreement containing the arbitration provision.

Moreover, the only contract Sunkist entered into, and hence the sole foundation of its claims, was the license agreement with SSD providing for litigation of disputes thereunder. In contrast, plaintiff entered into two agreements, the employment agreement with Nexxar and the stock purchase agreement with FT Ventures and other investors. Only the employment agreement contained an arbitration provision. As discussed in section III of this opinion, that agreement cannot reasonably be construed to impose an

obligation upon plaintiff to arbitrate claims against FT Ventures, particularly when those claims are based primarily on the stock purchase agreement. *See Indus. Elecs. Corp. of Wis. v. iPower Distrib. Group, Inc.*, 215 *F.*3d 677, 681 (7th Cir.2000) (holding that "[a] dispute that arises under one agreement may be litigated notwithstanding a mandatory arbitration clause in a second agreement, even where the two agreements are closely intertwined."); *Bouriez v. Carnegie Mellon Univ.*, 359 *F.*3d 292, 295 (3d Cir.2004) (same). Therefore, we conclude that plaintiff may be required to arbitrate only those claims that he has specifically agreed to submit to arbitration, and that the omission of any provision for arbitration of disputes in the stock purchase agreement with FT Ventures shows that plaintiff did not agree to arbitrate any claims he might assert against FT Ventures.

Accordingly, the dismissal of plaintiff's claims against Nexxar is affirmed. The order dismissing plaintiff's claims against FT Ventures is reversed, and the case is remanded to the trial court.