**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3674-21

GEORGIOS DROSOS and
GGLM LLC,

     Plaintiffs-Respondents,

v.

GMM GLOBAL MONEY
MANAGERS LTD., BUKLEIA
HOLDINGS LTD., BUKLEIA
USA INC., DREAMFOOD USA
LLC and CHRISTOS SAVVA,

     Defendants-Appellants,

and

IOANNIS NINIOS, MEA-G LLC
and P&C DEVELOPMENT NY
LLC,

     Defendants.

_____

Submitted January 19, 2023 – Decided November 14, 2023

Before Judges Accurso, Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1053-22.

Matsikoudis & Fanciullo, LLC, attorneys for appellants (William C. Matsikoudis and Derek S. Fanciullo, on the briefs).

Jeffrey A. Bronster, attorney for respondents.

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

In this complicated business dispute among related companies, their principals and agents, defendants GMM Global Money Managers Ltd., Bukleia Holdings Ltd., Bukleia USA Inc., Dreamfood USA LLC, and Christos Savva appeal from orders denying their Rule 4:6-2(e) motions to dismiss the complaint of plaintiff GGLM LLC and its sole member Georgios Drosos and to compel arbitration. Because we conclude GGLM agreed to arbitrate its dispute with defendants in Dreamfood's "9th Amendment Amended and Restated Operating Agreement," we reverse the trial court's denial of defendants' motions to dismiss DGGLM's complaint and compel arbitration of its claims.

As to Drosos's individual claims, we conclude his claims for indemnification for actions he took on behalf of Dreamfood and its members must be arbitrated, as well as his claims for misappropriation, conversion and

2

conspiracy against defendants GMM, Bukleia Holdings, Bukleia USA, Dreamfood, Savva and Ionnis Ninios, an employee and director of GM, brought on behalf of himself and GGLM. We lack enough information, however, about Drosos's alleged $89,502.65 personal loan to Dreamfood to determine whether defendants Dreamfood and Bukleia USA, against whom that claim is pled, could, under principles of agency or otherwise, enforce the operating agreement's arbitration provision against Drosos, and thus remand that claim to the trial court for additional discovery.

Because this appeal arises from the denial of defendants' motions to dismiss, we recount the facts as alleged in plaintiffs' February 2022 complaint. Kernahan v. Home Warranty Adm'r of Florida, Inc., 236 N.J. 301, 309 (2019). Drosos, an individual residing in Greece, is the owner and sole member of GGLM, a New Jersey limited liability company. Drosos is also the founder of defendant Dreamfood, another New Jersey limited liability company, intended as the operating company for Drosos's GFG, "Greek from Greece" brand, developed to operate "a chain of stores that combined a Greek bakery with a café, serving light food throughout the day." During 2016, Dreamfood's first year of operation, Drosos brought in two partners, Georgios Theodoris, through his company, Moldini, LLC, and Ionnis Chitos, through his company,

3

Elatis USA, LLC.  "Through their respective companies, Drosos, Theodoris, and Chitos each became a one-third owner in Dreamfood."

In 2017, Drosos opened the first two GFG stores, GFG Hoboken, owned eighty-five percent by Dreamfood and five percent each by three individual investors, and GFG William in Manhattan, eighty percent of which was owned by a New York limited liability company formed by Dreamfood.  The success of those first two stores, "laid the groundwork for significant expansion," requiring infusions of more capital into Dreamfood to finance the expansion.

Drosos claimed that at about that time, a man named Nikos Paschalakis approached him about being GFG's first franchisee, and "Dreamfood allowed Paschalakis to study the GFG business operation over a long period of time, giving him broad access to the company and its trade secrets, including access to vendors, renderings, and other forms of Dreamfood's confidential GFG business information."  In their complaint, however, plaintiffs allege it was all a front, and Paschalakis was actually "a corporate spy planted by a Greek businessman, George Korres, to learn the details of Dreamfood's operation so that Korres could open his own chain of competing cafes, modeled on Dreamfood's business plan."

A-3674-21

Drosos claims he discovered this ruse in 2018 when Paschalakis and Korres opened a competing store called Fournos Theophilos in Manhattan. Drosos alleged they modeled this store "directly on the GFG business model, exploiting trade secrets that Paschalakis [had] stolen and using branding and publicity materials so similar to that of GFG as to constitute actionable infringement." By that time, Dreamfood had agreed to buy out Moldoni's interest, leaving GGLM and Elati as equal owners of the company. A few months later, "Drosos and Chitos took on a new partner, Christos Pangiotopoulos," who paid $2,000,000 for a one-third interest through his company, P&C Development NY, LLC, "such that Drosos, Chitos, and Pangiotopoulos, through their respective companies," each owned one-third of Dreamfood.

After Fournos Theopolis opened a second store, Dreamfood decided to sue. Dreamfood's efforts to negotiate a pre-litigation settlement, however, were not met by Korres or Paschlakis, but by defendant GMM, "a Cypriot investment firm handling approximately two hundred million dollars in investor funds," acting through one or more of its wholly-owned companies, namely defendant Bukleia Holdings, a Cypriot company incorporated in Cyprus in 2017, which plaintiffs allege, on "information and belief, was

formed for the exclusive purpose of participating in the Korres venture that evolved into Fournos Theophilos." Plaintiffs claim Bukleia Holdings was incorporated while Paschalakis was "engaged in his corporate spying activities," that it "was aware of these acts of corporate spying," and was conspiring "with Korres and Paschalakis in stealing Dreamfood trade secrets relating to the GFG Brand."

Plaintiffs further allege either GMM or Bukleia Holdings formed wholly owned Estia Holdings USA Ltd. in 2017 to further the scheme. They claim Estia "controlled and was an owner of" Fournos Theophilos's management company. Plaintiffs allege GMM/Bukleia Holdings responded to Dreamfood's requests for settlement negotiations with Estia and proposed a merger of GFG and Fournos Theophilos, wherein "the Theophilos name would be retired, and the existing stores would come under the umbrella of the far more successful GFG name."

Plaintiffs claim that to effectuate the proposed settlement, either GMM or Bukleia Holdings formed a new, wholly owned Delaware corporation, defendant Bukleia USA. In December 2019, a merger of the two brands [Fournos Theophilos and GFG] took place, "with Dreamfood acquiring and essentially retiring Estia Holdings," and Bukleia USA paying $2,000,000 for

6

an ownership interest in Dreamfood. Dreamfood took on another investor at the same time, MEA-G, LLC, owned by Anastasia Giannopoulos, which paid $1,000,000 for its interest. Thus, after the merger, GGLM, Elati, P&C, and MEA-G each owned twenty-one percent of Dreamfood, and Bukleia USA owned sixteen percent.

In December 2019, the five Dreamfood owners became signatories to the "9th Amendment Amended and Restated Operating Agreement," appointing Drosos the sole manager of Dreamfood with "the right and power individually to manage and operate the Company and to do all things necessary to carry on the purpose, business and objectives of the Company" in accordance with a September 2019 business plan. GMM director, Ninios, signed the agreement on behalf of Bukleia USA and Drosos signed on behalf of GGLM.

After COVID-19-related closures in the Spring of 2020, Drosos, who had been living in Greece, returned to the United States in June 2020 to reopen the GFG stores. In early 2021, Elati left Dreamfood as part of a negotiated settlement for a $2,300,000 payout over several years, leaving GGLM, P&C, MEA-G LLC, and Bukleia USA each with an approximately twenty-five percent interest in Dreamfood.

7

Notwithstanding the setbacks caused by the pandemic, plaintiffs claim that "Dreamfood and the GFG brand continued their expansion," opening two stores in Pennsylvania, with planned locations in Newark, Boston, Rye, New York, and Milwaukee.[1] Drosos was also in discussions for a nationwide chain of GFG franchises. Plaintiffs allege "GFG thereafter entered into an agreement to take over the leases for 25 Dairy Barn locations, one in Connecticut and 24 throughout Long Island," ten of which had opened as of the date of the complaint. They claim that "[a]s of the summer of 2021, primarily through the efforts of Drosos, Dreamfood had not only survived the pandemic, it had managed to continue its expansion and increase the GFG brand recognition, and to revive the prospect of nationwide franchising."

By the beginning of 2021, Dreamfood had hired defendant Savva as its chief financial officer. Drosos alleged Savva was "Bukleia's designated representative," and had been set to be the manager of Fournos Theophilos in 2019, had the Dreamfood merger fallen through. Plaintiffs allege Savva was the former CEO of a pension fund in Cyprus, where he "developed relationships with persons in positions of power within GMM."

---

[1] Plaintiffs allege Drosos struck a deal with Milwaukee Bucks player, Giannis Antetokounmpo, to make him a representative of the GFG brand.

A-3674-21

In July 2021, Drosos, exhausted from the year spent traveling in the United States building the GFG brand, stepped down as Dreamfood's manager and CEO with the understanding he would stay "active in the company's affairs." Over Drosos's objection, Savva took his place. Plaintiffs allege Savva subsequently "shared less and less information with Drosos and isolated him more and more from any involvement with decision-making." Plaintiffs claim Savva told Drosos "he did not take direction from Drosos" and "the only person from whom he took orders on the operation of the company was defendant Ioannis Ninios, an employee and Director of GMM."

In August 2021, Drosos, on behalf of GGLM, supported a $2 million Dreamfood capital call, with the first payment due six months later, not knowing GMM and Bukleia Holdings had earlier conspired with Korres to steal GFG information and Dreamfood trade secrets to open a competing chain, and "that GMM, Bukleia Holdings, Bukleia USA, Ninios, Savva, and others presently unknown were involved in a conspiracy to remove Drosos from Dreamfood entirely, to appropriate his brand, to deprive GGLM of its ownership interest in Dreamfood, and to otherwise convert to itself the benefits of Drosos's years of hard work developing the GFG Brand."

A-3674-21

Plaintiffs allege that "[b]y the end of 2021, Savva had cut Drosos out of the operations and activities of the company virtually completely." And in January 2022, suddenly and "without any public announcement or any notice to Drosos or GGLM," Savva essentially shut down the GFG brand, "closing virtually every GFG restaurant except for a single one, GFG William." Plaintiffs allege Drosos was not advised Dreamfood was considering closing even a single store, much less nearly all of them, a month before the first payment on the capital call was due. They claim Drosos didn't learn of the mass closing "until after it had already been completed," and "his subsequent efforts to obtain an explanation from Dreamfood have been ignored."

Plaintiffs allege that since closing the stores, "Savva, under the direction of, and with the knowledge and approval of other members of the conspiracy, has taken additional steps to damage the GFG brand" and "to destroy the reputation of Drosos, who is so personally associated with that brand in the eyes of the public and of the business community." Plaintiffs claim Savva stopped making lease payments on GFG locations, including on some Drosos personally guaranteed "so as to enable the company to obtain the leases," making "it inevitable that Drosos will now be sued on those guarantees of obligations that belong to Dreamfood." They also claim Savva and Dreamfood

10

have failed to pay invoices to GFG vendors as well as taxes "for which Drosos may become personally liable."

Plaintiffs allege on information and belief that "Savva, with the full knowledge, consent, and approval of his co-conspirators, has been forging, and continues to forge Drosos's signatures on company checks" to further "the scheme of the co-conspirators to eliminate Drosos from the company, in that Dreamfood is making payments to new vendors with which [it] has established relationships for the future, while refusing to pay those vendors with whom Drosos had done business." Plaintiffs contend Savva is defaulting on the payments due Elati under Dreamfood's settlement agreement, as well as personal loans Drosos and GGLM made to Dreamfood.

Plaintiffs further claim, "as Dreamfood knows full well, Drosos will not pay hundreds of thousands of dollars on the upcoming capital call in view of the deliberate destruction of his brand, the closing of all stores, and the destruction of his reputation that the conspirators have caused, both negligently and intentionally." They claim that although Drosos asked Dreamfood to "extend the deadline for the capital call so that the shareholders can meet to discuss the shut-down of the stores and the future of the company[,] . . . Bukleia, which has been conspiring to push Drosos out of

11

Dreamfood," has refused to allow "any such extension, knowing that it will use the capital call to dilute GGLM's interest in the company."

Plaintiffs claim that "[a]s a result of all of the foregoing, GMM, Bukleia, and the remaining conspirators have succeeded in stealing the dream that Georgios Drosos created," as they "stand ready to use his business plan, his knowledge, his experience, and his reputation, all of which it has misappropriated, to build a new company that will lead to a nationwide franchise empire."

In their five count complaint, plaintiffs sought the appointment of a receiver for Dreamfood (count 1); Dreamfood's repayment of a $176,891 loan GGLM made to Dreamfood in September 2019, and an $89,502.65 loan Drosos made to Dreamfood "thereafter" (count 3); damages for misappropriation, conversion, and conspiracy against defendants GMM, Bukleia Holdings, Bukleia USA, Ninios, Dreamfood, and Savva, as well as an injunction prohibiting them from using the name or likeness of Drosos in any promotional literature, contending those "defendants have converted, and continue to convert property of . . . plaintiffs, including the ownership interest of GGLM that Bukleia has now positioned itself to appropriate through the coming dilution of GGLM's shares," with "the deliberate devaluation of the

12

GFG brand," and Dreamfood's continued misappropriation of Drosos's name and image, "featuring them prominently on the internet in promotional literature, all without Drosos's knowledge or consent" (count 4).

The remaining two counts of the complaint are not brought on behalf of both plaintiffs. Count 2 of plaintiffs' complaint is a claim brought solely on behalf of Drosos against defendants Dreamfood, Bukleia USA, MEA-G, and P&C for indemnification "from Dreamfood and its Members," on whose behalf he personally guaranteed leases for certain GFG locations, as well as any personal liability he might incur for certain taxes Dreamfood has failed and refused to pay for which the Internal Revenue Service may have recourse against Drosos personally. Count 5 of the complaint is a claim brought solely on behalf of GGLM against defendants Savva and Bukleia USA for breach of their fiduciary duties, alleging "Savva acted as the point man for the conspiracy by GMM, Bukleia and other defendants to force Drosos personally out of the company, and to dilute and ultimately destroy any ownership interest of GGLM."

13

Defendants[2] filed motions under Rule 4:6-2 to compel arbitration invoking the arbitration clause in Dreamfood's Operating Agreement:

> All members agree that any controversy or claim arising out of or relating to this Agreement, or any dispute arising out of the interpretation of this Agreement, which the parties are unable to resolve, shall be finally resolved and settled exclusively by binding arbitration by a single arbitrator acting under the Rules of the American Arbitration Association ("AAA") then in effect rather than the parties going into litigation in the Judicial Court system. If the parties cannot agree upon an arbitrator from the panel provided by the AAA, then each party shall choose its own independent representative and such representatives shall choose the arbitrator within thirty days of the date of the selection of the first independent representative. Each Party shall bear the costs of its participation in the arbitration procedure. The parties hereby recognize and consent to the jurisdiction of the courts of the state of New Jersey as the sole jurisdiction for enforcement of the arbitration award.

In opposition to the motions, Drosos certified that "[n]o one on behalf of Dreamfood, including its attorney, ever explained the contents of the Operating Agreement to [him]." He claimed that "[w]hen [he] signed the Operating Agreement [he] did not understand that GGLM was giving up any right to sue in an American court," and "also did not have an understanding of

---

[2] Plaintiffs were apparently unable to serve MEA-G, P&C, and Ninios, and all were dismissed without prejudice. They are not parties to this appeal.

the precise nature of GGLM's right to a jury trial, and [he] certainly did not understand that GGLM was giving up any such right."[3]

The trial court denied defendants' motions, finding the arbitration clause "falls short of the arbitrability criteria" set forth in Atalese v. U.S. Legal Services Group, LLP, 219 N.J. 430 (2014), and Flanzman v. Jenny Craig, Inc., 244 N.J. 119 (2020), because, "[w]hile referencing a proceeding before an arbitrator, it makes no mention of the fact that the signatory is waiving the critical right to a trial by jury" and "does not explain either the fact that, or the manner in which 'arbitration and civil litigation are distinct proceedings.'" (quoting Flanzman, 244 N.J. at 137). The court concluded the language of the arbitration clause "presumes a level of understanding of the arbitration process that few laymen have" and thus "lacks a clear and knowing waiver by the parties of the right to trial and right to a jury."

On defendants' motion for reconsideration, the court rejected the argument that the Atalese standard does not apply to arbitration agreements between sophisticated entities. The court found it did not need to reach the

---

[3] Drosos further certified he had "little or no knowledge of the American justice system" and didn't know civil cases to have jury trials, as "in Greece, there is no such thing as a jury trial in civil cases."

issue because the arbitration clause "lacks clarity as to [the] essential requirements of the arbitration clause," making it unnecessary "to engage in any 'sophistication' analysis."

Defendants appeal, reprising their arguments that "the Dreamfood arbitration clause is sufficiently clear because it plainly states that the parties are waiving their right to sue in court"; that the parties, as "sophisticated businesses," are not subject to "the heightened clarity requirement for arbitration clauses with consumers"; that Dreamfood is entitled to invoke the arbitration clause in its own operating agreement; that Savva may invoke the arbitration clause under agency principles; and that GMM and Bukleia Holdings, as either a parent company to a signatory of the operating agreement or a company with a controlling interest in a signatory, are both entitled to invoke the arbitration clause; and that Drosos's personal claims are also subject to arbitration under the agreement.

Our review of a trial court's decision on a motion to dismiss a complaint and compel arbitration is de novo. See Flanzman, 244 N.J. at 131. We owe no special deference to the trial court's interpretation of an arbitration provision, which we view "with fresh eyes." Morgan v. Sanford Brown Inst., 225 N.J. 289, 303 (2016).

The parties do not dispute that the arbitration clause in Dreamfood's operating agreement comes within the broad reach of the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16.  See Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 55-56 (2003).  As our Supreme Court has noted on a number of occasions, Congress's intent in enacting the FAA was "to abrogate the then-existing common law rule disfavoring arbitration agreements 'and to place arbitration agreements upon the same footing as other contracts.'"  Martindale v. Sandvik, Inc., 173 N.J. 76, 84 (2002) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)).

The Court in Atalese explained "[a]n arbitration clause, like any contractual clause providing for the waiver of a constitutional or statutory right, must state its purpose clearly and unambiguously."  219 N.J. at 435.  The Court was also clear, however, that an arbitration clause need not contain a "prescribed set of words . . . to accomplish a waiver of rights."  Id. at 447.  "Whatever words compose an arbitration agreement, they must be clear and unambiguous that a consumer is choosing to arbitrate disputes rather than have them resolved in a court of law."  Ibid.  Explaining its holding in Atalese, the Court in Flanzman, declared an enforceable arbitration clause "required language that explains that a party who agrees to arbitration waives the right to

sue in court and makes clear that arbitration and civil litigation are distinct proceedings."  Flanzman, 244 N.J. at 137.

Considering the Dreamfood arbitration clause in light of the Court's holdings in Atalese and Flanzman, we are convinced the trial court erred in deeming the clause unenforceable because it doesn't state "the signatory is waiving the critical right to a trial by jury" and fails to explain the distinction between arbitration and civil litigation.  As the Court has repeatedly held, "[n]o magical language is required to accomplish a waiver of rights in an arbitration agreement.  Our courts have upheld arbitration clauses that have explained in various simple ways 'that arbitration is a waiver of the right to bring suit in a judicial forum.'"  Morgan, 225 N.J. at 309 (quoting Atalese 219 N.J. at 444).

The Dreamfood arbitration clause makes the point clearly that the members agree "that any controversy or claim arising out of or relating to [the] Agreement" would be "finally resolved and settled exclusively by binding arbitration by a single arbitrator acting under the Rules of the American Arbitration Association . . . rather than the parties going into litigation in the Judicial Court system," language meeting the standard of Atalese.  See 219 N.J. at 445 (endorsing our holding in Griffin v. Burlington Volkswagen, Inc.,

411 N.J. Super. 515 (App. Div. 2010), affirming the enforceability of an arbitration clause providing that "[b]y agreeing to arbitration, the parties understand and agree that they are waiving their rights to maintain other available resolution processes, such as a court action or administrative proceeding, to settle their disputes").

That the Dreamfood clause does not mention specifically that the signatories were waiving a jury trial does not preclude its enforcement. As defendants rightly note, neither Atalese nor Flanzman requires specific "jury trial" language to accomplish a waiver of rights. See Atalese, 219 N.J. at 447; Flanzman, 244 N.J. at 137. See also Kernahan, 236 N.J. at 320 (reiterating that Atalese "imposes no talismanic recitations, acknowledging that a meeting of the minds can be accomplished by any explanatory comment that achieves the goal of apprising the consumer of her rights").

The Dreamfood arbitration provision is "sufficiently clear, unambiguously worded, satisfactorily distinguished from the other Agreement terms, and drawn in suitably broad language to provide a [signatory] with reasonable notice of the requirement to arbitrate all possible claims arising under the contract." See Curtis v. Cellco P'ship, 413 N.J. Super. 26, 33 (App. Div. 2010). Because we are satisfied the arbitration provision meets the

19

Atalese standard, we need not consider the parties' arguments as to whether Atalese extends to commercial arbitration agreements between sophisticated parties. But see Cnty. of Passaic v. Horizon Healthcare Servs., Inc., 474 N.J. Super. 498, 504 (App. Div.) (holding "an express waiver of the right to seek relief in a court of law to the degree required by Atalese is unnecessary when parties to a commercial contract are sophisticated and possess comparatively equal bargaining power") certif. granted 254 N.J. 69 (2023).

We also agree with defendants that Dreamfood can invoke the arbitration clause in its own operating agreement. Although Dreamfood is not a signatory to its operating agreement, N.J.S.A. 42:2C-12 expressly provides "[a] limited liability company is bound by and may enforce [its] operating agreement, whether or not the company has itself manifested assent to the operating agreement." This plain statutory language entitles Dreamfood to arbitrate plaintiffs' claims against it to the same extent as any Dreamfood member could. See Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 293 (Del. Sup. Ct. 1999) (finding a limited liability company bound by its operating agreement, although signed only by the members and not by the limited liability company itself); see also Comments to the Uniform Limited Liability Company Act (2006) (amended 2013) (Nat'l Conf. of Commr's on Unif. State

Ls., Draft Aug. 19, 2015) (ULLCA) at section 102, paragraph 13 (noting the definition of operating agreement "must be read in conjunction with Sections 105 through 107, which further describe the operating agreement.  In particular, although this definition refers to 'the agreement . . . of all the members,' the limited liability company itself is bound by and may enforce the agreement").

We reject plaintiffs' argument that non-member defendants GMM, Bukleia Holdings and Dreamfood managing member Savva may not invoke the arbitration clause in the Dreamfood operating agreement against plaintiff GGLM.  The law is well settled that "arbitration may be compelled by a non-signatory against a signatory to a contract on the basis of agency principles." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 192 (2013).

We held in Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 568-69 (App. Div. 2007), that agency principles permitted a non-signatory parent company, Deutsche Bank, to enforce the arbitration clause in the account agreement signed by its "separately incorporated indirect subsidiary," Deutsche Bank Securities Inc.  We reasoned that Deutsche Bank Securities, in brokering the purchase and sale of the bank's securities when the bank itself could not, had "assumed the role of [Deutsche Bank's] agent," and that the

21

Deutsche Bank Securities transaction was integral to the plaintiff's claims against Deutsche Bank, that is, the plaintiff relied on the transaction "to assert his claims against [the bank]." Id. at 569.

In EPIX Holdings Corp. v. Marsh & McLennan Cos., 410 N.J. Super. 453 (App Div. 2009), we held a non-signatory parent corporation could enforce the arbitration clause in the payment agreement signed by its corporate subsidiary based on equitable estoppel. We reasoned that plaintiff's complaint alleged an "integral relationship" between the corporations, that is, they conspired with each other to manipulate the insurance market to raise premiums; that plaintiff's claims against the parent were "identical to" its claims against the subsidiary; and that the plaintiff's claims against the parent were "inextricably intertwined" with the payment agreement, such that "no cause of action against the [parent] would have arisen" had the plaintiff not entered into the agreement with the subsidiary. Id. at 467-68.

The Supreme Court in Hirsch agreed the non-signatory corporate parent in EPIX had standing to enforce the arbitration clause, but disagreed with our estoppel theory, finding we had mistakenly concluded "the intertwinement of claims and parties in the litigation — in and of itself — was sufficient to give a non-signatory corporation standing to compel arbitration." 215 N.J. at 193.

"The appropriate analysis," the Court explained, "would have focused on the agency relationship between the parent and subsidiary corporations in relation to their intertwinement with the plaintiff's claims and the relevant contractual language."  Ibid.

Plaintiffs allege in their complaint that Bukleia USA, a signatory to the operating agreement, is wholly "owned and controlled either by GMM directly, or through Bukleia Holdings," which plaintiffs allege "is a Cypriot company wholly owned" by GMM and "formed for the exclusive purpose of participating in the Korres venture that evolved into Fournos Theophilos."  The complaint states that "GMM and Bukleia Holding worked with George Korres to have a corporate spy infiltrate the GFG companies so as to learn its trade secrets, including its business plan, its vendors, and other proprietary information upon which they then based the Fournos Theophilos brand."

Plaintiffs allege that GGM, Bukleia Holdings, and Bukleia USA subsequently continued the scheme begun by GGM, Bukleia Holdings and Korres "to steal Drosos's business plan for a novel and potentially hugely successful food business for their own profit," by installing Savva, "who by his own admission took his instructions from defendant Ninios, an employee and

23

Director of GMM," as their "frontman" to "isolate and eventually eliminate Drosos" and dilute GGLM and Drosos's economic stake in Dreamfood.

Plaintiffs' complaint plainly alleges that GMM and Bukleia Holdings, acting though their agents, Dreamfood member Bukleia USA and Dreamfood manager Savva, have conspired "to remove Drosos from Dreamfood entirely, to appropriate his brand, to deprive GGLM of its ownership interest in Dreamfood, and to otherwise convert to [themselves] the benefits of Drosos's years of hard work developing the GFG Brand." The relationship between GMM and Bukleia Holdings and Bukleia USA, Dreamfood and Savva is the through line of plaintiffs' complaint and the focus of all their claims. Those relationships and their intertwinement with plaintiffs' claims and the Dreamfood operating agreement allow GMM, Bukleia Holdings and Savva to enforce the arbitration agreement against GGLM under the test in Hirsch.[4] See Hirsch 215 N.J. at 193.

That leaves Drosos's personal claims for indemnification "from Dreamfood and its Members" for any personal liabilities he might incur for

---

[4] As plaintiffs' claims against Savva arise solely out of his role as manager of Dreamfood, he may also demand they arbitrate those claims under Dreamfood's operating agreement. See Wasserstein v. Kovatch, 261 N.J. Super. 277, 285-86 (App. Div. 1993).

acts he took on their behalf; his claim for damages for misappropriation, conversion, and conspiracy against defendants GMM, Bukleia Holdings, Bukleia USA, Dreamfood, and Savva; and repayment of an $89,502.65 loan he made to Dreamfood.

Drosos's claims for indemnification from Dreamfood and its members arise out of actions he took as Dreamfood's manager and CEO, and thus must be arbitrated under the operating agreement. See Wasserstein v. Kovatch, 261 N.J. Super. 277, 286 (App. Div. 1993). We are also satisfied Drosos must arbitrate his claim for damages for misappropriation, conversion, and conspiracy against GMM, Bukleia Holdings, Bukleia USA, Dreamfood, and Savva.

"'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Angrisani v. Fin. Techs. Ventures, L.P., 402 N.J. Super. 138, 148 (App. Div. 2008) (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986)). Thus "a court must always inquire, when a party seeks to invoke its aid to force a reluctant party to the arbitration table, whether the parties have agreed to arbitrate the particular dispute." United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 570-71 (1960) (Brennan, J., concurring).

Drosos has not separated his claims for misappropriation, conversion, and conspiracy from those of GGLM, and a review of the complaint strongly suggests they cannot be untangled from one another. Even Drosos's claims for misappropriation of his name and likeness are bound up with GGLM and Dreamfood. In their complaint, plaintiffs allege Drosos is publicly identified "as essentially being the personification of GFG," the "Greek from Greece" brand "as is reflected . . . in [Dreamfood's] publicity materials posted on the internet." Although it appears undisputed that Dreamfood owns the GFG and "Greek from Greece" brands, plaintiffs allege "Dreamfood continues to misappropriate his name and his image, featuring them prominently on the internet in promotional literature."

GGLM, as a member of Dreamfood, is, of course, obligated to arbitrate all claims arising out of the operating agreement, which Drosos, as GGLM's sole member, signed on its behalf. And although plaintiffs' claims for misappropriation, conversion, and conspiracy sound in tort, "[a]s a general rule, courts have construed broadly worded arbitration clauses to 'encompass[ ] tort, as well as contract claims.'" Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 137 (2001) (alteration in original)

(quoting Bleumer v. Parkway Ins. Co., 277 N.J. Super. 378, 405 (Law Div. 1994)).

We've long recognized that "[a]rbitrability of a particular claim 'depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause.'" Jansen v. Salomon Smith Barney, Inc., 342 N.J. Super. 254, 258 (App. Div. 2001) (quoting Wasserstein, 261 N.J. at 286). Here, we're satisfied Drosos's claims are so clearly intertwined with those of his company, GGLM, all of which arise out of and relate to the Dreamfood operating agreement and its alleged breach, as to make Drosos's claims arbitrable along with those of DGLLM, of which Drosos is the sole member. See Jansen, 342 N.J. Super. at 258.

The circumstances may be different, however, with respect to the $89,502.65 loan Drosos allegedly made to Dreamfood. The complaint provides no information about this loan other than the amount; not even a date is provided. Because we lack sufficient information about Drosos's loan to Dreamfood to determine the nature or arbitrability of Drosos's claim for repayment of his loan, we remand the issue to the trial court for additional discovery and resolution.

In sum, we reverse the trial court's denial of defendants' motions to compel arbitration of the claims by DGGLM, as well as Drosos's individual claims for indemnification and for damages for misappropriation, conversion and conspiracy and remand for entry of an order compelling plaintiffs to arbitrate those claims. We vacate the order denying arbitration of Drosos's $89,502.65 personal loan to Dreamfood and remand the claim to the trial court to determine whether defendants Dreamfood and Bukleia USA, against whom that claim is pled, could, under principles of agency or otherwise, enforce the arbitration provision against Drosos. Should that claim remain in the Law Division, it must be stayed pending arbitration. See Perez v. Sky Zone LLC, 472 N.J. Super. 240, 251 (App. Div. 2022). We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3674-21